### In re T.P. LONG CHEMICAL, INC., Debtor.

**Bankruptcy No. 581–906.**

United States Bankruptcy Court, N.D. Ohio.

Jan. 3, 1985.

---

Frederick Corns, Akron, Ohio, for Banc-Ohio Nat. Bank.

Emanuel Mazur, Akron, Ohio, for trustee.

Alan Ross, Asst. U.S. Atty., U.S. Dept. of Justice, Cleveland, Ohio, Roger Grimes, U.S. Environmental Protection Agency, Region V, Chicago, Ill., for U.S. E.P.A.

Harold Corzin, Akron, Ohio, Trustee.

## FINDING AS TO ADMINISTRATIVE EXPENSES

H.F. WHITE, Bankruptcy Judge.

The matter before the court presents complex and important issues arising from the impact of two governmental policies. The policies are embodied in federal environmental laws and the Bankruptcy Code. The core issue concerns a dispute over funds held by the trustee. The parties to this dispute are: the United States Environmental Protection Agency ("E.P.A."); BancOhio National Bank ("BancOhio"); and the trustee of the estate of the T.P. Long Chemical Company, Inc., the debtor herein.

The E.P.A.'s presence in this proceeding, and hence this dispute, can be traced to an act of vandalism that resulted in a release of a hazardous chemical. Pursuant to its authority under the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. section 9601 et seq., the E.P.A. removed the hazardous material. It then filed an application to be reimbursed by the estate for the costs which it incurred.

Both the trustee and BancOhio opposed the E.P.A.'s application. The trustee argued that he was not responsible for removing the environmental hazard. BancOhio opposed the E.P.A.'s application because it claimed a security interest in some of the funds held by the trustee.

On April 5, 1984, the court held a hearing on this matter at which time the court ruled that the E.P.A. was entitled to partial reimbursement as a first priority administrative expense. This result was never reduced to a final written order. The court, therefore, will address this issue in the present finding and order.

The E.P.A. also seeks reimbursement pursuant to section 506(c) of the Bankruptcy Code, 11 U.S.C. section 506(c), from the funds in which BancOhio claims a security interest.[1] The court did not decide this issue at the previous hearing. It also must be addressed in the present finding and order.

The parties have filed numerous briefs in this matter as well as a stipulation of facts. Based on the briefs, the stipulation of facts, the record as reflected in the official court file, and the hearings on this matter, the court now finds as follows:

## FINDING OF FACTS

1. The T.P. Long Chemical Company, Inc. ("debtor") was incorporated under the laws of Ohio in 1972 and operated as a rubber recycling plant at 1092 Evans Avenue, Akron, Ohio.

2. The corporate stock was owned by Mr. T.P. Long. Mr. Long was the officer operating the debtor's business.

3. The real property at 1092 Evans Avenue was at all relevant times jointly owned in fee simple by Mr. Long and his wife, Joyce C. Long, and leased to the debtor.

4. At all relevant times, all the property located at 1092 Evans Avenue, whether real or personal, constituted a "facility" as defined by section 101(9) of CERCLA, 42 U.S.C. section 9601(9).[2] (The court shall hereafter refer to this facility as the "Long facility" or the "Long site".)

5. On May 29, 1981, the debtor filed for reorganization under Chapter 11, of the Bankruptcy Code. On February 1, 1982, this court ordered the Chapter 11 case of the debtor converted to a case under Chapter 7 of the Bankruptcy Code. Harold A. Corzin was appointed interim trustee and continues to serve as trustee of the debtor's estate.[3]

6. On February 5, 1982 the First National Bank of Akron commenced a civil action against Mr. and Mrs. Long and other parties in the Common Pleas Court of Summit County, Ohio, Case No. 82-2-0355. This action was brought to foreclose against the real property located at 1092 Evans Avenue.

7. On February 18, 1982 Jeffrey T. Heintz was appointed in the state court foreclosure action as receiver for the real property located at 1092 Evans Avenue. On this same date the receiver padlocked the premises at 1092 Evans Avenue pursuant to authority granted by the state court.

8. BancOhio holds a perfected security interest in the accounts receivable, equipment, fixtures, inventory, and other personal property of the debtor as well as the proceeds thereof.

---

1. All references to the Bankruptcy Code herein are to the Code as it existed prior to the recently enacted Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98-353, 98 Stat. 333. That Act's substantive amendments to the Bankruptcy Code do not apply to this case.

2. 42 U.S.C. Section 9601(9) defines "facility" as follows:
    "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, la-

goon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;

3. The interim trustee appointed under 11 U.S.C. section 701(a) continues to serve as the trustee pursuant to 11 U.S.C. section 702(d) if the creditors fail to elect a trustee.

9. The receiver allowed the trustee to store the personal property of the debtor's estate on the real property at 1092 Evans Avenue pending its sale.

10. On June 22, 1982, the trustee conducted an auction at which all of the personal property of the debtor's estate was sold except for certain drums containing various substances which, unknown to anyone except Mr. T.P. Long, were buried at the rear of the Long site. These drums were subject to BancOhio's security interest. This court confirmed the auction sale by the trustee on July 27, 1982.

11. The property of the estate was sold at the auction to the Tompkins Corporation and/or Leonard Tompkins individually (hereinafter referred to collectively as "Tompkins"). After payment was tendered Tompkins set about removing the property purchased.

12. Included in the property purchased by Tompkins was a tank containing sulfur monochloride. This tank was not removed from the Long facility.

13. Sulfur monochloride is a hazardous substance as defined by section 101(14) of CERCLA, 42 U.S.C. section 9601(14). Approximately 90 of the drums which were buried at the rear of the Long facility and which were not sold also contained hazardous substances as defined by CERCLA.

14. In August 1982, Mr. Edward Vitale, an employee, associate, or former employee or associate, of Tompkins opened a valve on the tank containing sulfur monochloride resulting in a release of a hazardous substance.

15. On August 30, 1982, the E.P.A. determined that the release of hazardous substances at the Long facility warranted immediate action. The E.P.A. asked the trustee to take the necessary remedial action but the trustee refused. Accordingly, the E.P.A. initiated cleanup activities at the

Long facility. During the course of these activities, the buried drums containing hazardous material were discovered.

16. The E.P.A. sampled the drums and the soil at the Long facility. It diked the area containing the drums and then removed and disposed of the drums and the contaminated soil. It also drained the tank of sulfur monochloride and disposed of the contaminated soil near the tank. The E.P.A. incurred total costs of $37,859.35 to perform this removal action.

17. The E.P.A. has admitted that the costs attributable to cleanup of the sulfur monochloride are not allowable as an administrative expense because at the time of the release, the tank was not property of the estate and because the cleanup of the soil immediately adjacent to the tank involved real property which never was property of the estate.[4] Only the costs attributable to the cleanup and removal of the buried drums and surrounding soil is claimed as an administrative expense. The parties failed to stipulate what portion of the total amount incurred by the E.P.A. is attributable to the cleanup and removal of the drums. The E.P.A. asserts that approximately $24,000.00 is so attributable.

18. BancOhio has already received $40,000.00 from the trustee which amount represents proceeds from the sale of the debtor's personal property. At the present time there is approximately $29,000.00 in the debtor's estate, of which $12,335.43 represents proceeds from the sale of the debtor's property and in which BancOhio has a perfected security interest.

## ISSUES

The issues are as follows:

1. Are the expenses incurred by the E.P.A. in removing the hazardous material from the Long facility allowable as an administrative expense?

---

**4.** The E.P.A. does seek reimbursement of these costs as a general unsecured creditor. It argues that, under CERCLA, the debtor is responsible because it was an owner or operator of the Long facility at the time the sulfur monochloride was stored there. *See* 42 U.S.C. section 9607(a)(2). The E.P.A.'s argument for reimbursement as a general unsecured creditor for the costs attributable to the sulfur monochloride spill is academic; there are no funds in the estate to pay general unsecured creditors.

**282**

2. Is the E.P.A. entitled to recover the cost of removing the hazardous material from the funds in which BancOhio has a security interest?

## LAW

### I

The Bankruptcy Code provides that there shall be allowed as an administrative expense "the actual, necessary costs and expenses of preserving the estate".... 11 U.S.C. section 503(b)(1)(A). Administrative expenses are entitled to the first priority of payment. 11 U.S.C. section 507(a)(1). The E.P.A. argues that, since the estate is liable under CERCLA, the costs attributable to the removal of the drums and the contaminated soil adjacent thereto should be allowed as an administrative expense.

The trustee offers essentially two arguments in reply. He first asserts that the estate is not liable to the E.P.A. for any costs under CERCLA. The trustee also argues that since he has the power to abandon the drums under 11 U.S.C. section 554(a), the costs incurred by the E.P.A. cannot be charged as an administrative expense.

■ Section 107(a) of CERCLA, 42 U.S.C. section 9607(a), provides *inter alia* that the owner or operator of any facility shall be liable for "all costs of removal or remedial action incurred by the United States Government".[5] The liability imposed by section 107(a) of CERCLA is strict liability. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823 (W.D.Mo.1984); *United States v. Price*, 577 F.Supp. 1103 (D.N.J. 1983); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa. 1982). CERCLA does provide for certain affirmative defenses,[6] but the trustee has

5. The full text of 42 U.S.C. section 9607(a) reads:
(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and
(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

6. Section 107(b) of CERCLA, 42 U.S.C. section 9607(b) provides:
(b) There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
(1) an act of God;
(2) an act of war;
(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
(4) any combination of the foregoing paragraphs.

not asserted any of these defenses. Instead, the trustee argues that he was never either an owner or an operator of the Long facility and thus the estate is not liable to the E.P.A. under CERCLA.

In the sense that the trustee did not acquire title to the property of the estate, he is technically correct that he is not an owner of the Long facility. In the sense that no business operations were being conducted at the Long facility at the time the trustee was appointed, he is technically correct that he is not an operator of the Long facility. Nonetheless, the court finds that the estate is liable to the E.P.A. under CERCLA.

Under the former Bankruptcy Act, the trustee did acquire title to the bankrupt's property.[7] This is no longer the case under the present Bankruptcy Code. Section 541(a) of the Bankruptcy Code stipulates that, upon the commencement of a bankruptcy case, an estate is created which is comprised of "all legal or equitable interests of the debtor in property". See 11 U.S.C. section 541(a). The debtor's ownership interest in the drums, i.e. the debtor's title to the drums, became, therefore, an interest includable in property of the estate. Thus, it is the estate itself and not the trustee which is the owner of the drums.

The trustee, pursuant to section 323 of the Bankruptcy Code, is the representative of the estate. As such he can sue or be sued. Although the trustee does not hold title to the estate property, the Bankruptcy Code does provide him with certain powers associated with ownership. Chief among these powers is the power to use, sell, or lease property of the estate as provided in section 363 of the Bankruptcy Code.

Another power which the trustee has under the Bankruptcy Code is the power to operate the debtor's business. This power applies to both a Chapter 11 trustee and a Chapter 7 trustee.[8] Although the trustee has not operated the debtor's business, the debtor, as debtor in possession, did operate the business at the Long facility while the case was under Chapter 11.

The E.P.A.'s claim for an administrative expense is a claim against the estate, not against the trustee. The trustee is involved only insofar as he is the representative of the estate. The issue is whether the estate, not the trustee, is liable under CERCLA.

As stated above, owners and operators of hazardous waste facilities are liable under CERCLA. Unfortunately, the definition of "owner or operator" is not very helpful.[9] Courts have generally held, however, that the liability provisions under CERCLA should be given a broad construction. *United States v. Northeastern Pharmaceutical & Chemical Co., supra; United States v. Price, supra; State Ex. Rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983); *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982).

7. Section 70(a) of the Bankruptcy Act, the former 11 U.S.C. section 110(a), provided in part:

The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located...

8. The trustee's authority to operate a debtor's business under Chapter 11 derives from 11 U.S.C. section 1108 which provides: "Unless the court orders otherwise, the trustee may operate the debtor's business." The trustee's authority to operate a debtor's business under Chapter 7 derives from 11 U.S.C. section 721 which provides: "The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."

9. 42 U.S.C. section 9601(20)(A) states, in pertinent part: "'owner or operator' means ... (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any abandoned facility, any person who owned, operated, or otherwise controlled activities at such facility prior to abandonment."

To be liable, an owner or operator must be a "person" as defined by CERCLA.[10] Given the policy of broad construction, this court has no difficulty in finding that the debtor, and hence the debtor's estate, is a person as defined by CERCLA.

Furthermore, the court finds that the debtor's estate is liable to the E.P.A. under CERCLA. As was mentioned above, the estate had an ownership interest in the drums of hazardous material. The drums themselves fall within CERCLA's broad definition of "facility".[11] The estate is, therefore, liable under section 107(a) of CERCLA, 42 U.S.C. section 9607(a).

Having found that the estate is liable for the costs of the removal action incurred by the E.P.A., the court must address the question of whether this liability is affected by the trustee's power to abandon property.

The trustee argues that since the drums were not sold with the rest of the debtor's property at the estate auction, they must be deemed abandoned. The trustee cites section 554(c) of the Bankruptcy Code to support his argument. This section states: "Unless the court orders otherwise, any property that is scheduled under section 521(1) of this title and that is not administered before a case is closed under section 350 of this title is deemed abandoned." 11 U.S.C. section 554(c).

It is clear from a reading of the above text that section 554(c) does not support the trustee's argument. Since the debtor's Chapter 7 case has not yet been closed, the drums cannot be deemed abandoned. This point is confirmed by section 554(d), 11 U.S.C. section 554(d), which stipulates: "Unless the court orders otherwise, property of the estate that is not abandoned under subsection (a) or (b) of this section and that is not administered in the case remains property of the estate". Thus, since the trustee had not taken positive steps to abandon the drums and since the case has

not been closed, the drums were still the property of the estate at the time the E.P.A. took its removal action.

But could not the trustee abandon the drums after they and their contents were discovered? That the drums were still property of the estate at the time the E.P.A. commenced its removal action should not be decisive. The real issue is whether the trustee's authority to abandon burdensome property of the estate may be used in any way to avoid the estate's liability under CERCLA.

The power of the trustee to abandon property of the estate is codified in section 554(a) of the Bankruptcy Code, which provides: "After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate". 11 U.S.C. section 554(a). It is undisputed that the drums are burdensome to the estate. Except for the procedural requirement of notice and a hearing, it would appear that nothing in the text of section 554(a) prohibits the trustee from abandoning the drums.

Mere abandonment of the drums is not the ultimate goal sought by the trustee. The ultimate goal is to escape the estate's obligation to the E.P.A. under CERCLA. Abandonment is viewed as a means to this end. This exposes the trustee's argument to two lines of attack, both of which the court finds persuasive.

Assuming that the trustee is permitted to abandon the drums, the court finds that this in no way affects the estate's liability under CERCLA. Alternatively, if it is assumed that abandonment would relieve the estate of liability under CERCLA, then the court finds that abandonment may not be permitted.

If the drums were abandoned, they would cease to be property of the estate and the estate's interest therein would re-

---

**10.** 42 U.S.C. section 9601(21) states: "'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body;"

**11.** *See* note 2, *supra.*

vert to the debtor. It does not necessarily follow, however, that the estate's liability for the environmental damage caused by the drums would also be transferred to the debtor. Although the drums are the source of the estate's liability under CERCLA, that liability cannot simply be transferred with the drums.

Abandoning the drums does not change the fact that the estate was an owner or operator of the drums under section 107(a) of CERCLA. Even if the estate had abandoned the drums before it was discovered that they posed an environmental danger, the estate would still be liable under section 107(a)(2) of CERCLA.[12] In short, once the drums became property of the estate, the estate became potentially liable under CERCLA. This liability is based on the estate's relationship to the drums, but is independent of the drums themselves. Subsequent abandonment or transfer of the drums does not transfer the estate's liability.

CERCLA itself provides that any ostensible transfer of liability is ineffective. Section 107(e)(1) of CERCLA states: "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any other person who may be liable under this section, to any other person the liability imposed by this section". 42 U.S.C. section 9607(e)(1). Thus, even if an estate could otherwise escape liability by the trustee's abandonment of property such an abandonment would not be effective under CERCLA.

Beyond this provision of CERCLA, there is persuasive bankruptcy case authority that, under the facts of the present case, the trustee should not be permitted to abandon the drums. Cases under both the prior Bankruptcy Act as well as the present Bankruptcy Code have placed inherent limits on the trustee's power to abandon burdensome property.

There was no statutory authority for the trustee to abandon burdensome property in liquidation cases under the former Bankruptcy Act. Specific provisions did allow abandonment of specific property of the estate [13], but the general power to abandon was judicially created. See 4A Collier on Bankruptcy, Paragraph 70.42 at 502 (14th ed. 1976). The power of the trustee to abandon property under the former Act was not absolute; it was "subject to the application of general regulations of a police nature". Id. at 504, citing Ottenheimer v. Whitaker, 198 F.2d 289 (4th Cir.1952), aff'g. 102 F.Supp. 913 (D.Md.1952), and In re Chicago Rapid Transit Co., 129 F.2d 1 (7th Cir.1942) cert. denied, 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942).

In Ottenheimer the trustee sought to abandon three barges located in the Baltimore harbor. The barges had a combined value of $1,300.00 and had to be frequently pumped to prevent their sinking. If the barges were abandoned, they would sink and obstruct the passage of other vessels. Both the District Court and the Court of Appeals held that the trustee could not abandon the barges because abandonment would constitute a violation of 33 U.S.C. section 409. This section provided, inter alia: "It shall not be lawful ... to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels". The court would not allow the trustee to abandon property which would create a menace to navigation.

In Chicago Rapid Transit the court held that the reorganization trustee for a railroad could not abandon service on a branch line even though operating the line would be burdensome to the estate. The court held that, since the railroad was a public

---

**12.** Section 107(a)(2) imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" 42 U.S.C. section 9607(a)(2).

**13.** See, sections 64(a)(4), 70(a)(2), and 70(b), former 11 U.S.C. sections 104(a)(4), 110(a)(2), and 110(b), respectively. These sections allowed abandonment of property burdened by, respectively: taxes; pending applications for patents, trademarks, and copyrights; and executory leases.

utility subject to state regulation, abandonment of service could not be permitted without the consent of state authorities. The court found that the trustee's power to abandon was subject to valid state laws.

*In re Lewis Jones, Inc.*, 1 BCD 277 (Bkrtcy.E.D.Pa.1974) is another case under the former Bankruptcy Act which held that a trustee's power to abandon burdensome property was subject to the concerns of public interest. The court acknowledged that there were no federal or state laws which prohibited the trustees from abandoning the manholes, vents, and steam pipes sought to be abandoned. If the property were abandoned, however, it would pose a great danger to the health and safety of the public. The court determined that the trustees should first seal the manholes, vents, and pipes, the cost to be charged to the bankrupt estates, before filing an application to abandon the property.

The holdings in *Lewis Jones, Ottenheimer*, and *Chicago Transit*, were based, in part, on the fact that the trustee's power to abandon was judicially created. The *Ottenheimer* court stated:

It seems obvious to us that a rule which is not provided by statute but built up by the courts to facilitate the administration and distribution of assets of a bankrupt estate should not be extended to reach such an unreasonable and unjust result. The judge made rule must give way when it comes into conflict with a statute enacted to ensure the safety of navigation ...

*Ottenheimer v. Whitaker, supra*, 198 F.2d at 290.

Under the present Bankruptcy Code, the trustee's power to abandon property has been codified and no longer derives from a judge made doctrine. This raises the question of whether the exception to abandonment found in *Ottenheimer* and the other Act cases still applies to abandonment under section 554 of the Bankruptcy Code.

Such an exception was found in *In re Quanta Resources Corp.*, 739 F.2d 912 (3d Cir.1984). The court in *Quanta Resources* held that the trustee could not abandon a waste oil processing and storage facility where such abandonment would not comply with state and local laws regulating the abandonment of such wastes. Although the court acknowledged *Ottenheimer's* emphasis on abandonment as a judicially created doctrine, it found that *Ottenheimer, Lewis Jones*, and *Chicago Transit* stand for the proposition that the trustee's power to abandon property is subject to laws and general equitable principles which protect some important public interest. The court also found that this public policy exception applies under the Bankruptcy Code as well as under the former Act. *In re Quanta Resources Corp., supra*, 739 F.2d at 918.

The court finds that this public policy exception applies in the present case. The congressional policy underlying CERCLA is that those who generate, use, or transport hazardous material should be required to pay the cost of damages caused by the hazardous materials. *Jones v. Inmont Corp.*, 584 F.Supp. 1425 (S.D.Ohio 1984); *United States v. Northeastern Pharmaceutical & Chemical Co. supra; United States v. Reilly Tar & Chemical Corp., supra.* Congress has provided that this liability cannot be transferred. 42 U.S.C. section 9607(e)(1). Furthermore, courts have found that CERCLA imposes strict liability. *United States v. Northeastern Pharmaceutical Co., supra; United States v. Price, supra; City of Philadelphia v. Stepan Chemical Co., supra.* These provisions were enacted to protect the public from the damage caused by hazardous wastes. Since the debtor, as a debtor in possession under Chapter 11, continued to operate the Long facility, and since the estate had an ownership interest in the drums, these provisions apply in the present case. The court will not permit the estate to escape this liability by abandoning the drums.

Since the estate cannot avoid the liability imposed by CERCLA, it follows that the cost incurred by the E.P.A. in discharging this liability is an actual necessary cost of preserving the estate entitled to administrative expense priority. *Cf. In re Ver-*

*mont Real Estate Investment Trust,* 25 B.R. 804 (Bkrtcy.Vt.1982) (expenses incurred in removing dangerous building from debtor's leasehold treated as administrative expense). The necessity of the expense cannot be questioned since the removal of the wastes was an obligation of the estate under CERCLA. The court recognizes that this decision will deplete the assets of the estate. The success of the E.P.A. in pursuing its administrative claim is achieved at the expense of the creditors of the debtor. The court can sympathize with the creditors but finds that this is a risk which the creditors must bear. Creditors must generally bear the risk of any enterprise. Congress has decided that administrative expenses should be paid prior to other claims against the estate. The estate cannot avoid its legal obligations merely by invoking concern for the general creditors.

## II

■ The unencumbered assets of the estate are insufficient to pay the administrative expense claim of the E.P.A. The E.P.A., therefore, seeks payment out of funds held by the trustee which are subject to BancOhio's security interest.[14] The E.P.A. relies on section 506(c) of the Bankruptcy Code which provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim".

By its own terms, section 506(c) refers to a trustee's power to recover expenses from a secured creditor. The E.P.A. argues that it stands in the shoes of the trustee since it performed a duty imposed upon the trustee to remove the hazardous wastes. The

court agrees with the E.P.A. Since the E.P.A. discharged a duty of the trustee, it may seek recovery from the funds claimed by BancOhio to the same extent as the trustee.

■ Section 506(c) represents an exception to the traditional rule that the costs of administration of a bankruptcy estate may not be charged against secured creditors. *In re Trim-X, Inc.,* 695 F.2d 296 (7th Cir.1982); *In re Tyne,* 257 F.2d 310 (7th Cir.1958). Normally a trustee acts for the benefit of the general creditors. Where the trustee acts for the benefit of secured creditors, however, the estate should not bear the cost. *Brookfield Production Credit Association v. Borron,* 738 F.2d 951 (8th Cir.1984); *In re Afco Enterprises, Inc.,* 35 B.R. 512, 11 B.C.D. 295 (Bkrtcy.D. Utah 1983); *In re Codesco, Inc.,* 18 B.R. 225, 8 B.C.D. 1089 (Bkrtcy.S.D.N.Y.1982). The trustee must bear the burden of proving that section 506(c) applies to the costs for which recovery is sought. *In re Trim-X, Inc. supra; Brookfield Production Credit Association v. Borron,* 36 B.R. 445 (E.D.Mo.1983), aff'd. 738 F.2d 951 (8th Cir.1984); *Dozoryst v. First Financial Savings and Loan,* 21 B.R. 392 (N.D. Ill.1982); *In re Korupp Associates, Inc.,* 30 B.R. 659 (Bkrtcy.Me.1983).

No party has challenged the amount of the cost incurred by the E.P.A. in removing the hazardous wastes. Thus, there appears to be no argument that the costs incurred by the E.P.A. were "reasonable". That the costs were necessary cannot be disputed either. The necessity of properly removing the hazardous wastes was imposed by Congress in enacting CERCLA. It is also undisputed that the E.P.A. incurred these costs in disposing of property.

---

**14.** It is not clear whether the E.P.A. seeks recovery from BancOhio for just that portion of its claim which is allowable as an administrative expense or for the full amount of its claim including the costs attributable to the release of the sulfur monochloride. To the extent that the E.P.A. relies on 11 U.S.C. section 506(c), it can only recover from BancOhio costs allowed as administrative expenses. The cases under section 506(c) make clear that that section allows

recovery only of administrative expenses. *In re Flagstaff Foodservice Corp.,* 739 F.2d 73 (2d Cir. 1984); *Brookfield Production Credit Association v. Borron,* 738 F.2d 951 (8th Cir.1984); *In re Trim-X, Inc.,* 695 F.2d 296 (7th Cir.1982); *In re Codesco, Inc.,* 18 B.R. 225, 8 B.C.D. 1089 (Bkrtcy.S.D.N.Y.1982); *In re Hotel Associates, Inc.,* 6 B.R. 108, 6 B.C.D. 939 (Bkrtcy.E.D.Pa. 1980).

The remaining issue is whether BancOhio received any benefit as a result of the removal action. Traditional costs associated with the preservation or disposition of property such as appraisers' fees, auctioneers' fees, advertising costs, moving expenses, storage charges, and repair and maintenance costs are usually found to benefit the holder of a secured claim. *See,* 3 *Collier on Bankruptcy,* paragraph 506.6 (15th ed. 1984). Such expenses enable the creditor to either realize or preserve the value of its collateral. *See* e.g. *In re Trim-X, Inc., supra,* 695 F.2d at 301; *In re Neu-Deli Corp.,* 19 B.R. 175 (Bkrtcy.S.D. Ala.1982); *In re Hamilton,* 18 B.R. 868, 8 B.C.D. 1116 (Bkrtcy.Colo.1982).

Clearly BancOhio did not receive any benefit in this traditional sense. The auction at which its collateral was sold occurred before the E.P.A. commenced its removal action. Thus, the E.P.A.'s expenditure cannot be considered as a cost incident to the sale of property such as a fee for an appraiser or auctioneer. Nor can the E.P.A.'s expenditure be considered as a cost of preserving BancOhio's collateral. The drums themselves had no value as collateral to secure the bank's claim against the debtor. Thus, so far as BancOhio is concerned, there was no value in the drums worthy of preservation. The so-called preservation of the drums was of no benefit to BancOhio.

There is no doubt that the actions of the E.P.A. benefitted the general public. To the extent that BancOhio is a member of the general public it too received a benefit. This general benefit is unrelated to BancOhio's status as a holder of a secured claim. The E.P.A. must prove that its action in regard to BancOhio's collateral benefitted BancOhio insofar as it is a holder of a secured claim.

The court has already found that BancOhio did not receive a benefit in a positive sense. The E.P.A.'s expenditure did not benefit the bank in the actual preservation or sale of its collateral. If, however, the expenditure of the E.P.A. discharged a liability of BancOhio with regard to its collat-

eral, then Banc-Ohio may have received a benefit as a result of the E.P.A.'s removal action.

The E.P.A. suggests that it is inappropriate for BancOhio to segregate its collateral so that it may benefit from the collateral sold, but ignore the unsold collateral which has become a liability. This contention is without merit. A creditor takes a security interest in property in order to secure an obligation that is owed to it. If the collateral becomes worthless or poses a risk to the public, the creditor is under no obligation to assume possession of the collateral or to insure against the risk. A creditor does not assume such responsibility over collateral merely by acquiring a security interest.

The creditor does assume a financial risk when it takes a security interest in collateral. The creditor always bears the inherent risk that the value of the collateral will be insufficient to protect it in the case of default by the obligor. BancOhio has had to bear the burden of this risk in the present case when it found itself undersecured. This court will not add to this risk by making the creditor the insurer of all risks caused by its collateral.

The court also finds that BancOhio is not responsible under CERCLA for the costs incurred by the E.P.A. The E.P.A. suggests, but does not specifically state, that BancOhio is liable under CERCLA as an owner or operator. The E.P.A. argues that the trustee's obligation to abate the hazard would have extended to BancOhio had it sought to sell its collateral pursuant to its security agreement. The E.P.A. then argues that this liability cannot be avoided by transferring ownership of the collateral.

■ The court must reject this argument. The court finds that even if BancOhio had repossessed its collateral pursuant to its security agreement it would not be an "owner or operator" as defined under CERCLA. The term owner or operator is defined, in relevant part, in section

101(20)(A) of CERCLA.[15] The last sentence of this section is: "Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility". 42 U.S.C. section 9601(20)(A). The only possible indicia of ownership that can be attributed to Banc-Ohio is that which is primarily to protect its security interest. It is undisputed that BancOhio has not participated in the management of the Long facility. Thus, Banc-Ohio cannot be held liable as an owner or operator under CERCLA.

■ It follows, that the expenditure made by the E.P.A. did not discharge a liability of, and hence did not confer a benefit on, BancOhio. Since the court has failed to find any other possible benefit to BancOhio as a result of the costs incurred by the E.P.A. under CERCLA, the court concludes that the E.P.A. cannot recover any portion of its expenditure from Banc-Ohio pursuant to 11 U.S.C. section 506(c).

The E.P.A. makes a final argument unrelated to section 506(c) of the Bankruptcy Code. It argues that, as a matter of equity, it should be able to recoup its costs from BancOhio. It argues that it should be granted an equitable lien and it cites for support *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) and *Cleveland Clinic Foundation v. Humphrys*, 97 F.2d 849 (6th Cir.1938).

In *Humphrys*, a mother was entitled to receive monies from a trust fund specifically earmarked for the support of her minor children. Mrs. Humphrys did not seek or receive funds from the trust but instead expended her own funds to raise the children. When the children died prematurely, she sought reimbursement from the trust. The Sixth Circuit held that she had an equitable lien against the trust and that she should be reimbursed. The court stated: "If plaintiff, not a volunteer, by caring for and maintaining her children, dis-

charged an obligation of the McBride trust, she is entitled to recoupment." *Id.* at 856.

*Humphrys* is readily distinguishable from the present proceeding. In *Humphrys*, the plaintiff discharged an obligation of the trust. In the present case the E.P.A. did not discharge an obligation of BancOhio. It did discharge an obligation of the trustee of the estate and the court has found that it may recover from the estate. This finding is consistent with *Humphrys*. *Humphrys* does not support the proposition that the E.P.A. may recover from BancOhio.

In *Reading Co. v. Brown, supra*, the Supreme Court held that a tort claim arising in the course of a Chapter 11 arrangement should be treated as an actual and necessary expense of arrangement rather than as a general claim against the bankrupt. This is consistent with this court's holding that the E.P.A. holds an administrative expense claim against the estate. There is nothing in *Reading Co. v. Brown* to suggest that the tort claimants can recover from secured creditors of the bankrupt. It does not support the E.P.A.'s contention that it should obtain recovery from BancOhio.

■ The court finds that, as a matter of equity, the E.P.A. may not recoup its expenses from BancOhio. BancOhio has already suffered a loss on its loan to the debtor. This is the commercial risk it assumed when it agreed to extend credit to the debtor. It would be inequitable, however, to make BancOhio bear the risk of all damage caused by property in which it holds a security interest.

The court has found that the costs incurred by the E.P.A. qualify as an administrative expense. BancOhio should not be expected to bear the costs of these administrative expenses merely because the estate has insufficient assets. *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir. 1984); *Brookfield Production Credit Association v. Borron, supra; In re Korupp Associates, Inc. supra; In re Codesco, su-*

---

**15.** *See* note 9, *supra.*

*pra.* That the E.P.A. will not be fully reimbursed is neither attributable to, nor the responsibility of, BancOhio.

BancOhio and the E.P.A. are equally innocent parties. Neither the law nor equity requires the one to reimburse the other. Each must bear its own loss.