## In re VERNON SAND & GRAVEL, INC., Debtor.

### Bankruptcy No. B81–01887–Y.

United States Bankruptcy Court,
N.D. Ohio.

Nov. 14, 1988.

James H. Beck, Canfield, Ohio, Michael D. Buzulencia, Warren, Ohio, William J. Urban, Jr., Warren, Ohio, for debtor.

Mark G. Bonaventura, Asst. Atty. Gen., Environmental Enforcement Section, Div. of Reclamation, Columbus, Ohio, for Ohio Div. of Reclamation.

Carl D. Rafoth, Youngstown, Ohio, Trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause came before the Court on the Debtor's Objection to the Proof of Claim filed by THE OHIO DEPARTMENT OF NATURAL RESOURCES, DIVISION OF RECLAMATION ("ODR").

The Debtor was initially incorporated in 1972 for the purpose of mining and selling sand, gravel, and other crushed stone. The site of the Debtor's operations was owned by Mr. James H. Burn, former President of the Debtor, who leased it to the Debtor–Corporation. The Debtor operated from

1972 until 1978, when new state laws for regulation of surface mining required it to obtain a permit from ODR. As a result, the Debtor undertook a variety of steps in order to gain a permit,[1] which was subsequently granted on January 11, 1978. Thereafter, annual reports were submitted to ODR, each of which included a topographical map of the affected area. On December 18, 1981, the Debtor filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code. On June 30, 1982, the Debtor entered into a property lease with STATE SLAG, INC. ("SSI") for the purpose of removing slag and scrap iron from a site in Struthers, Ohio, which was owned by SSI. On May 31, 1983, the Debtor's case was converted to a proceeding under Chapter 7. The Debtor was unable to make lease payments to Mr. Burn which caused him to default on his obligations to the mortgage holder, ALLIS–CHALMERS CREDIT CORPORATION ("AC"). By virtue of its mortgage interest, AC apparently obtained title to the property. On October 24, 1984, AC transferred the property to GENERAL AGGREGATES, INC. ("GA"), an Ohio corporation, whose principal was Ms. Gail McCreary. On July 12, 1986, Ms. McCreary and Mr. Burn were married. An Order of Reclamation was entered by the Chief of the Division of Reclamation on August 26, 1986. On January 8, 1987, Ms. McCreary Burn formed COUNTRYSIDE SALES & SALVAGE ("CSS") as a subsidiary of GA. CSS currently operates a salvage operation on the Debtor's former business site. ODR filed a Proof of Claim for the reclamation of 7.5 acres of land which the Debtor allegedly affected after the Chapter 11 Petition was filed in the amount of Sixty–Three Thousand, Two Hundred Fifty & 00/100 Dollars ($63,250.00) on April 20, 1987. The Debtor anticipated ODR's claim and had filed an objection to it on April 19, 1988. A hearing on the claim was commenced on July 11, 1988, and concluded on July 12, 1988.

■ Initially, we consider two issues of law which arose in this proceeding. The first question involves the burden of proof for which each of the parties are responsible in an objection to claim. Bankruptcy Rule 3001(f) provides that a properly executed and filed Proof of Claim is endowed with *prima facie* evidentiary effect. Thus, the objector has the burden of going forward with evidence sufficient to defeat the presumption of correctness. If the objector succeeds in overcoming the *prima facie* effect of the claim, the burden of going forward devolves upon the claimant. Regardless, however, the ultimate burden of persuasion always remains the claimant's responsibility. *In re Distrigas Corp.*, 75 Bankr. 770, 773 (Bankr.D.Mass.1987); *In re Unimet Corp.*, 74 Bankr. 156, 165 (Bankr.N.D.Ohio 1987). As one commentator noted:

> While the burden of ultimate persuasion is always on the claimant, and while probative force is given to the allegations in that creditor's proof of claim, the trustee, nonetheless, carries the burden of going forward to meet, overcome, or at least equalize, what operates in favor of the creditor by the force of Section 502(a) and ... [Bankruptcy] Rule [3001(f)].

3 *Collier on Bankruptcy*, Sec. 502.01(3) (15th ed. 1979).

■ The second issue of law questions the propriety of according administrative expense priority to reclamation costs which are incurred post-Petition. 11 U.S.C. Sec. 503(b)(1) provides that administrative expenses include:

> (A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

The Sixth Circuit has already held in *In re Wall Tube and Metal Products Co.*, 831 F.2d 118 (6th Cir.1987) that costs incurred by a state in responding to improper disposal of hazardous substances should be deemed an administrative expense. *Id.* at

---

**1.** The Debtor was required to submit such things as a projection of planned mining activity and subsequent reclamation of the affected area

and certificates of deposit in an initial amount of Three Thousand, Seven Hundred Fifty & 00/100 Dollars ($3,750.00).

123. Although the Debtor attempts to distinguish the case, this Court believes the Sixth Circuit's reasoning in *Wall Tube* is applicable to this case.

First of all, 28 U.S.C. Sec. 959(b) provides, in part:

(b) ... a trustee ..., including a debtor-in-possession, shall manage and operate the property in his possession as such trustee, receiver or manager, according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

The Circuit Court concluded that the response costs were actual and necessary in order to "preserve the estate in required compliance with state law." *Id.* at 124. Similarly, in *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (Bankr.N.D.Ohio 1985), the Bankruptcy Court found that expenses incurred for the removal of hazardous material were allowable as an administrative expense because the expenses were "a necessary cost of preserving the estate because a removal of the waste was the estate's obligation under [federal law]." *Id.* at 286–87. The Debtor disputes the applicability of these cases insofar as they relate to environmental hazards which are a threat to the health, safety, and welfare of the public. While the magnitude of the danger from hazardous waste may be greater than that posed by unreclaimed land, it appears that safety considerations are still a factor. Mr. David Clark, a reclamation inspector for ODR, testified that approximately 1,000 feet of the highwall was very unstable and posed a danger to both pedestrian and motor traffic. He also testified that access to the site was virtually unrestricted. Mr. Randy Keitz, Project Engineer for ODR, also confirmed the highly fractured and unstable character of the highwall. Finally, the provisions found in Ohio Rev.Code Chapter 1514 appear to have been enacted for the health, safety, and welfare of the public. In *Call v. G.M. Sader Excavating & Paving, Inc.*, 68 Ohio App.2d 41, 426 N.E.2d 798 (1980), the court wrote:

Revised Code Section 1514.01 was enacted to moderate the adverse impacts of uncontrolled surface mining on the public health and safety, the natural beauty of the state of Ohio, the environment of the state, and the future use of the land being mined.

*Id.*, 426 N.E.2d at 799–800. It appears that the public interest would be served by ameliorating these safety concerns. It also appears that resolution of these safety considerations would argue for allowing the costs of reclamation as an administrative expense as the Circuit Court noted in *Wall Tube*. 831 F.2d at 124. Our decision is also consistent with the results reached in *United States Department of Interior v. Elliott*, 761 F.2d 168 (4th Cir.1985) [2] and *In re Pierce Coal & Construction Co.*, 65 B.R. 521 (Bankr.N.D.W.V.1986). Thus, applying the foregoing principles to the present case, the expenses sought by ODR, which are based on post-Petition Debtor conduct, may be claimed as administrative expenses because such costs were necessary both to preserve the estate in compliance with Ohio law, as required in 28 U.S. C. Sec. 959(b), and to protect the safety of the public.

The last issue relates to the amount which ODR is entitled to claim as an administrative expense priority. The Debtor's primary defense is that the mining activity, upon which ODR's claim is based, occurred pre–Petition, thus making it ineligible for classification as an administrative expense. In this regard, the Debtor introduced the annual reports with attached topographical maps which were submitted to ODR in 1982, (covering the period between January 12, 1981, and January 11, 1982) and 1983 (covering the period between January 11, 1982, and January 10, 1983). The reports both indicate a cumulative total of 20.1

2. The Court is not persuaded by Debtor's attempt to distinguish the *Elliott* case. Although the case only dealt with the allowance of post-Petition environmental penalties as an administrative expense, it would be anomalous to allow administrative expense priority to penalties, but not to cleanup costs upon which the penalties are based.

affected acres under the permit. The maps are also identical in the amount of affected land shown. The Court notes, however, that the 1982 report originally reported 19.6 acres affected to date, and the amendment to 20.1 acres was recorded on April 6, 1982. The circumstances surrounding amendment of the report might affect the probative value of the 1982 report. Unfortunately, neither the Debtor nor ODR undertook to explain the reason for the change. In any event, the aerial photographs taken by the OHIO DEPARTMENT OF NATURAL RESOURCES, DIVISION OF GEOLOGICAL SURVEY, REMOTE SENSING SECTION, appear to be dispositive on the extent of post-Petition mining. The aerial photographs clearly indicate the advancement of the highwall after March 24, 1982, when the initial photograph was taken. In regard to the affected land shown on the topographical maps for both years, Mr. Clark testified that there is no requirement that the exact location of the highwall face be disclosed on the maps. Thus, the maps cannot be relied upon to show that the condition of the highwall remained static during this period.

The Debtor also introduced the first accounting of the Debtor–in–Possession ("DIP Report") covering the period December 18, 1981, through July 31, 1982, which document was originally filed with the Court on September 21, 1982. Based upon the disbursement for drilling and blasting contained in the DIP Report, Mr. Burn testified that only two blasts could have occurred between December 18, 1981, and July 31, 1982. It was also his testimony that two blasts would only involve ten to eleven percent (10% to 11%) of an acre. Finally, Mr. Burn also testified that no blasting at the site occurred during 1982–83. The Court has some questions regarding the reliability of Mr. Burn's testimony. We do not doubt his sincerity nor do we believe he exhibited an intent to deceive. But, Mr. Burn misspoke at least twice during his testimony,[3] which raises questions concerning his correct recollection of other facts. Even if the Court were to accept Mr. Burn's testimony concerning the Debtor's lack of activity at the site, the result would be no different. The aerial photographs compel the conclusion that some individual or entity blasted rock from the highwall. Under Ohio law, liability would still attach to the Debtor as the permittee. *Dressler Coal Co. v. Division of Reclamation*, 23 Ohio St.3d 131, 491 N.E.2d 1133 (1986).

The second major defense which the Debtor asserted by way of implication is that reclamation requirements would adversely affect the opportunities for the continuation of business by CSS. First of all, the Court is not persuaded that reclamation would make CSS impossible to operate. The Debtor did not demonstrate why other storage areas either on or off the site were impracticable or unavailable. More importantly, though, this concern is largely irrelevant to whether ODR's claim ought to be accorded priority status. The Court is unaware of any statute or precedent that would make ODR's priority claim dependent on the use accorded the property to be reclaimed. If CSS believes its business interests will be irreparably harmed by reclamation, CSS's remedy is to seek injunctive or other relief in state court when ODR proposes to begin reclamation work. Finally, the Court is concerned over the possibility of collusion regarding this objection. The Court finds it hard to believe that Mrs. McCreary Burn bought the subject property and located her business there without knowledge that the property was subject to reclamation. In any event, this objection is not well-taken.

The last major objection revolves around whether the Debtor is entitled to a credit for the certificates of deposit which the Debtor provided in lieu of a surety bond as

---

**3.** Mr. Burn cited October 1978 as the date upon which a permit was granted to the Debtor. In fact, the permit was granted to the Debtor in January 1978. Mr. Burn also initially testified that his calculations indicated only one half of an acre was involved in the two blasts occurring in 1981–82. After consultation with his attorney, he indicated he had made a mistake and that only ten to 11 percent (10%–11%) of an acre would be affected by the two blasts.

required in Ohio Rev.Code Sec. 1514.04.[4] It appears that Nine Thousand, Four Hundred & 00/100 Dollars ($9,400.00) has already been paid over to ODR when the Debtor forfeited its posted bonds by failing to commence reclamation. However, of that amount, only Three Thousand, Seven Hundred Fifty & 00/100 Dollars ($3,750.00) is attributable to the 7.5 acres of land which were affected after the filing of the Petition and upon which ODR based its claim. According to the testimony of Mr. Keitz, the estimated cost of reclaiming the 7.5 acres of land is Sixty–Six Thousand, Nine Hundred & 00/100 Dollars ($66,-900.00). This amount, minus Three Thousand, Seven Hundred Fifty & 00/100 Dollars ($3,750.00), equals Sixty–Three Thousand, One Hundred Fifty & 00/100 Dollars ($63,150.00). This amount constitutes One Hundred & 00/100 Dollars ($100.00) less than ODR's filed claim. By appropriate Order, the Court will allow this amount as an administrative expense.

### ORDER

This cause came on for consideration on the Debtor's Objection to the Proof of Claim in the amount of Sixty–Three Thousand, Two Hundred Fifty & 00/100 Dollars ($63,250.00) which was filed by the OHIO DEPARTMENT OF NATURAL RESOURCES, DIVISION OF RECLAMATION ("ODR"). The Debtor's Objection is hereby overruled, and ODR's claim shall be allowed as an administrative expense in the amount of Sixty–Three Thousand, One Hundred Fifty & 00/100 Dollars ($63,-150.00).

IT IS SO ORDERED.

4. It appears that such bonds are not punitive in nature but rather are to be used "only for the purpose of reclaiming areas of land affected by surface mining operations on which an owner has defaulted." Sec. 1514.06, Ohio Rev.Code.