**In re Jonathan Hess PALMER, Debtor.**

**No. BKY 07–43810.**

United States Bankruptcy Court,
D. Minnesota.

April 7, 2009.

---

Kenneth E. Keate, Tax and Bankruptcy Attorney, P.L.C., Saint Paul, MN, for Debtor.

## MEMORANDUM OPINION AND ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for hearing on the objection of the debtor to amended claim

number 1–2[1] filed by the Internal Revenue Service. Kenneth E. Keate appeared for the debtor. James C. Strong appeared for the Internal Revenue Service.

This court has jurisdiction over this proceeding under 28 U.S.C. § 157(b)(1) and 1334 and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

## FACTS

1. Jonathan Hess Palmer was born in 1970. He earned a bachelor of arts degree from Morehouse College, where he majored in psychology and minored in theater. He has also completed some masters coursework in public affairs.

2. Palmer's work history is extensive and varied, but reflects very little in the way of managerial or business experience. Palmer has worked in a non-managerial capacity at a McDonald's restaurant; temped at the Department of Natural Resources; operated the switchboard for a neurological clinic; delivered pizzas for Domino's; worked for hospitals as an orderly, an administrative assistant, and in deaf ministry; and temped at Arthur Anderson in the areas of marketing and public relations.

3. In 2001, after an unsuccessful run for public office, Palmer was unemployed. His aunt notified him of an open position at a charter school, Hands On Cedar Hill Academy (the business name of Hands On Child Development, Inc.). Hands On was a small non-profit charter school in Minneapolis.

4. Palmer's aunt told him that Lorraine Smaller, the founder and director of Hands On, had a position open. Smaller needed someone who was good, smart, and with whom she could work well.

5. Smaller hired Palmer in May of 2001 to serve as the business manager. Smaller later gave Palmer the title of "deputy director," but his duties and responsibilities did not increase or change, he was not a member of the board of directors, and he never attended board meetings.

6. Smaller hired Palmer because of his writing and communication abilities, and in part because she believed he had some financial skills. Smaller hoped he would help her get a handle on the organization's financial health by keeping her up-to-date on Hands On's day-to-day financial picture, that Palmer would report to her on the organization's bills, and that she would then tell him which bills to pay and in which amounts.

7. At the time that Palmer joined Hands On, the school had about twenty employees, most of whom were teachers. Although Palmer's title was "business manager," initially his only accounting duty was to transfer employee hours and wage codes to the payroll company for the payroll company to prepare checks.

8. Before Palmer's employment, Smaller had paid Wendy Hines, an independent accountant, to prepare the organization's payroll and tax returns and to complete financial reports. Although Hines generally timely prepared the returns, Smaller often would file them late because Hands On did not have money to pay the taxes. Among the forms prepared by Hines were the 941 (Employer's Quarterly Federal Tax Return) and 990 (Return of Organization Exempt from Income

---

**1.** The debtor's motion objects to "Amended Claim No. 1–2." However, the most recent amended claim is claim number 1–3. I will treat the debtor's motion as an objection to IRS claim number 1–3.

Tax). Hines's work for Hands On over-lapped with Palmer's employment.

9. Smaller would call Hines with employee hours and wage codes, and Hines would prepare employee payroll checks. She would also prepare payroll tax deposit checks, which would be made out to the bank. The payroll tax deposits consisted of the employment taxes that Hands On was required to hold in trust for the government. Smaller often did not deposit the payroll tax deposit checks because she knew that Hands On's accounts did not have sufficient funds. When Smaller hired Palmer, Smaller was aware that the organization owed taxes but she did not tell Palmer about the tax problems.

10. When Palmer started working, he would call Hines with employee hours and wage codes and Hines would use that information to prepare the employee payroll checks and payroll tax deposit checks. She would then send the checks to Smaller.

11. Shortly after Palmer's employment, Hands On stopped using Hines's payroll services and switched to ADP. Palmer would send the employee hours and wage codes to ADP and ADP would prepare the employee payroll checks and payroll tax deposit checks. ADP would send the checks back to Smaller, who would copy the employee names and payroll amounts from the payroll checks onto checks for a different checking account because the account used by ADP had been levied on and did not contain sufficient funds. Palmer did not understand how the taxes made their way to the IRS, but believed that ADP was responsible for their transmission. In fact, neither ADP nor Smaller were placing the funds into a trust account or remitting them to the IRS.

12. Smaller was the sole decision-maker on all day-to-day financial matters. Smaller was aware of the ongoing tax problems but continued to pay her staff and other bills, as well as to instruct Palmer to pay certain bills. At times, there would not be enough money to pay even the teachers and their pay would be delayed.

13. At Hands On, Palmer was not authorized to make independent judgments with regard to Hands On's business decisions, nor did he ever exercise independent judgment. He never negotiated contracts, set salaries, hired or fired employees, prepared tax returns, determined the organization's financial policy, or attended board meetings. He had very limited discretion to write checks for some minimal expenses. He was authorized to sign checks and tax returns merely as a convenience for Smaller, who was overwhelmed by the work of running Hands On. When Hand On filed a chapter 11 bankruptcy petition on February 26, 2002, Palmer never met with the attorney or signed the petition, schedules or statements. He had no authority to open bank accounts or obtain credit, except when explicitly instructed by Smaller. If he had exceeded his authority and refused to pay bills as instructed or paid the IRS without permission, his employment would have been jeopardized.

14. Shortly after Palmer began working at Hands On, he became aware that the organization owed some amount of taxes to the federal government. Smaller directed Palmer to contact the IRS about the organization's tax liabilities. She was unsure how much the organization owed.

15. Believing the tax problems to stem in part from ADP's payroll services, Smaller instructed and authorized Palmer to open a new payroll services account at Wells Fargo. The payroll tax deposits still went unpaid for some time because Wells Fargo needed information from ADP but was unable to acquire it. Palmer attempt-

ed to learn more about the tax situation from Smaller and Hines but they were not forthcoming with information, perhaps due to their own confusion.

16. At Smaller's request, Palmer called the IRS and spoke with IRS Revenue Officer Christine Braziel. She told him that unless Hands On gave him its power of attorney, she could not speak with him about Hands On's tax problems. Palmer misinterpreted that requirement to mean that in order to speak with Braziel per his employer's instructions, he would have to convey significant authority over Hands On.

17. In anticipation of Palmer's meeting with the IRS, Hand On gave Palmer its power of attorney on July 9, 2001. The power of attorney lists Palmer as an employee, not as an officer or director.

18. Palmer met with Braziel on July 10, 2001 to gather information about Hands On's tax problems. During the meeting, Braziel completed IRS Form 4180 (Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax). Although Braziel did not tell Palmer that he needed to answer her questions affirmatively in order for her to talk with him about Hands On's tax problems, Palmer believed that to be true, based on their previous conversation about the power of attorney and the context in which the interview arose. Palmer misunderstood the purpose of the questions. In fact, the purpose of the questions was to establish Palmer's personal liability for the organization's tax deficiencies, not to establish his authority to gather information from the IRS on his organization's behalf.

19. Palmer greatly exaggerated the importance of his position in order to gather information from the IRS for Smaller. In response to Braziel's questions, Palmer told her that his duties, responsibilities and authority at Hands On included: hiring and firing employees, managing employees, directing or authorizing payment of bills, dealing with major suppliers and customers, negotiating large corporate purchases, opening or closing bank accounts, signing or countersigning corporate checks, guaranteeing or co-signing corporate bank loans, making or authorizing bank deposits, authorizing payroll checks, preparing federal payroll tax returns, authorizing payment of federal tax deposits, reviewing federal income tax returns, and determining company financial policy. Palmer signed the Form 4180. In truth, Palmer was not authorized to engage in any of those activities except when specifically directed by his supervisor, Smaller.

20. Over the next year, Palmer worked diligently to help the IRS and Hands On resolve their tax problems. He communicated frequently with Braziel and Revenue Officer Edward Olszewski. He assisted the IRS in determining which taxes had been paid and which taxes were still owed. He prepared detailed spreadsheets. Due in large part to Palmer's cooperation with the IRS and his hard work, Hands On made significant efforts to pay the IRS in spite of its low or negative cash flow, including sending the IRS a check in the amount of $15,000, which the IRS applied to Hands On's 1995 Fourth Quarter tax liability.

21. In 2001 or 2002, the IRS levied on Hands On's accounts. The Minneapolis Public School District cancelled Hands On's charter contract because of the levy. Hands On continued to negotiate with the IRS through Palmer, who notified the IRS that although Hand On was attempting to pay its back taxes, if the levy was not lifted, the school would cease operating and because it had no assets, the IRS would not be able to collect any taxes from

it at all. The levy continued and Hands On folded.

22. Palmer continued to sign checks and pay bills as instructed by Smaller after learning of the organization's failure to hold employment taxes in a trust fund or to pay them to the Treasury. The organization owed taxes from months and years prior to Palmer's employment as well as from months during Palmer's employment.

23. Palmer's employment at Hands On ended when it ceased operations in 2002. Everyone was laid off and the school closed its doors.

24. The IRS sent a letter to Palmer on August 24, 2004 notifying him that it was assessing a trust fund recovery penalty against him, based on Hands On's failure to collect and pay employment taxes. Palmer did not receive the letter and only learned of the penalty in 2007 when his income tax refund was seized. The IRS letter required a signature, and was held at the Lowry Hill Post Office for several years until Palmer learned of its existence and retrieved it in February of 2008.

25. On November 16, 2004, the IRS assessed trust fund recovery penalties against Palmer as follows:

| Tax Period: | TFRP Penalty Assessed: |
|---|---|
| June 30, 2001 | $19,084.91 |
| September 30, 2001 | $ 3,907.90 |
| December 31, 2001 | $ 9,047.69 |

The assessed penalties totaled $32,040.50.

26. The IRS assessed the penalties against Palmer primarily based on his representations to Braziel, including his answers to her Form 4180 interview. The IRS also assessed penalties against Smaller.

27. Palmer filed a chapter 13 petition commencing this case on October 23, 2007.

28. On October 29, 2007, the IRS filed proof of claim number 1–1 for responsible person trust fund penalties and for a 2006 income tax assessment made against Palmer, for a total of $44,081.60 in unsecured priority claims. Palmer objected to the proof of claim.

29. On February 13, 2008, the IRS filed amended proof of claim number 1–2, reducing the 2006 income tax assessment by $1183.37 and adding an unsecured general claim for $531.38 for a total of $43,379.02.

30. On November 20, 2008, the IRS filed amended proof of claim number 1–3, eliminating its claim for the 2006 income tax assessment and the unsecured general claim for $531.38, and reducing the total amount of its unsecured priority claims to $38,450.80.

31. Although Palmer alleges that the IRS misapplied payments made during his employment, he provided no evidence to support those allegations.

## ANALYSIS

■ Palmer bears the burdens of production and persuasion. Ordinarily, when a debtor objects to a proof of claim filed in his bankruptcy case, the claimant bears the burden of proof. *In re Vernon Sand & Gravel, Inc.*, 93 B.R. 580, 581 (Bankr. N.D.Ohio 1988). However, the Supreme Court has held that a debtor objecting to a tax claim for a responsible person penalty bears the burden of proof, just as the objector would outside of bankruptcy. *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). "Once the IRS makes an assessment of liability, the tax payer bears the burdens of production and persuasion as to all issues...." *Honey v. United States*, 963 F.2d 1083, 1087 (8th Cir.1992).

The tax penalty disputed by Palmer stems from the failure of his former employer to collect, hold and pay over federal taxes from employee wages. Employers

are required to withhold income and Social Security taxes from their employees' wages and place the funds in a trust, which is periodically turned over to the United States Treasury. 26 U.S.C. § 3102(a) ("The tax imposed by section 3101 shall be collected by the employer of the tax payer, by deducting the amount of the tax from the wages as and when paid."); 26 U.S.C. § 3402 ("[E] very employer making payment of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary."); and 26 U.S.C. § 7501(a) ("the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.").

Pursuant to 26 U.S.C. § 6672(a):

Any person *required* to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

(emphasis added). "Person" includes "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). If an officer or employee of an organization was under a duty to collect and pay trust fund taxes but willfully failed to do so, the officer or employee may be assessed a trust fund recovery penalty equal to the amount of the tax that the organization failed to pay over.

▮ Liability for a trust fund recovery penalty requires a two-part analysis. First, the court must determine whether a person was a responsible party; and second, if the person was a responsible party, the court must determine whether the person's failure to collect or pay the trust fund taxes was willful. *Kizzier v. United States*, 598 F.2d 1128, 1132 (8th Cir.1979). An employee maybe deemed a responsible person "if he has *significant*, albeit not necessarily exclusive, authority in the field of corporate decision making and action where taxes due the federal government are concerned[.]" *Hartman v. United States*, 538 F.2d 1336, 1340 (8th Cir.1976) (emphasis added). Significant authority constitutes more than "technical authority to sign checks and duty to prepare tax returns". *Barton v. United States*, 988 F.2d 58, 59 (8th Cir.1993). "The test is whether the person had control of the disbursements of the tax payer, that is, whether 'he had the final word as to what bills should or should not be paid, and when.'" *Anderson v. United States*, 561 F.2d 162 (8th Cir.1977) (quoting *Wilson v. United States*, 250 F.2d 312, 316 (9th Cir. 1957)).

▮ Palmer was not a responsibly party. He lacked the status, duty or authority to avoid Hands On's default in the collection or payment of its taxes. *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991) ("Responsible persons are those who have the status, duty and authority to avoid the corporation's default in collection or payment of the taxes."). Palmer had no independent decisionmaking authority at Hands On. If he had refused to pay bills as instructed by Smaller or if he had paid the IRS without Smaller's permission, he could have been fired. Although he possessed the technical authority to sign checks and tax returns, he did not have the final word, or any substantial influence, as to what bills should or should not be paid, and when.

■ "[R]esponsibility is a matter of status, duty, and authority, not knowledge." *Davis v. United States*, 961 F.2d 867, 873 (9th Cir.1992) (citing *Thibodeau v. United States*, 828 F.2d 1499, 1503 (11th Cir.1987) (per curiam); *Wood v. United States*, 808 F.2d 411, 415 (5th Cir.1987); *United States v. Vespe*, 868 F.2d 1328, 1334 (3d Cir. 1989)). Palmer had some knowledge that the organization owed taxes, but his knowledge was murky and his employer was not forthcoming with information regarding its tax liability. Even if he had known the extent of Hands On's tax liabilities, he could not have acted independently to pay the IRS or discontinue payments to other creditors without facing termination or even the sort of criminal and civil liabilities that could result from taking unauthorized actions with an organization's funds.

Palmer's actions, though at times misguided, were well-meaning attempts to bring a nonprofit school into good standing with the IRS so that it could continue to serve its students. Palmer's statements to Revenue Officers Braziel and Olszewski about his authority at Hands On were inaccurate and greatly exaggerated. The officers were justified in their belief, based on Palmer's Form 4180, that he was a responsible person. However, his statements are the only evidence that he possessed actual authority of any significance at Hands On, and they are contradicted by the credible testimony of Smaller, Hines and Palmer that Palmer was not anything more than a ministerial employee, an assistant to Smaller and an information-gatherer. He could not have paid the IRS or stopped paying other creditors without risking termination for exceeding the scope of his authority or for insubordination.

## ORDER

THEREFORE, IT IS ORDERED:

The Internal Revenue Service's amended claim number 1–3 is disallowed.