CALL, [CHIEF, DIVISION OF RECLAMATION, DEPT. OF
NATURAL RESOURCES,] APPELLEE, *v.* G. M. SADER
EXCAVATING & PAVING, INC., ET AL., APPELLANTS.

(Nos. F-79-3 and F-79-9—Decided March 28, 1980.)

*Mr. William J. Brown,* attorney general, and *Mr. Terrence Fay,* for appellee.

*Mr. Max E. Rayle* and *Mr. Thomas S. Middleton,* for appellants.

CONNORS, J. This decision is concerned with two cases that have been consolidated for appeal. Plaintiff-appellee, Charles E. Call (hereinafter plaintiff), is the Chief of the Division of Reclamation of the Ohio Department of Natural Resources. The Attorney General of Ohio initiated this matter on his behalf, representing the people of the state of Ohio, in the Court of Common Pleas of Fulton County. The state contended that defendants-appellants, G. M. Sader Excavating & Paving, Inc. (hereinafter the Sader Corporation), and William Joy (hereinafter Joy), violated R. C. Chapter 1514 when agents of the Sader Corporation removed materials from Joy's Swan Creek Township property. The state sought an order enjoining the Sader Corporation from engaging in surface mining until it obtained a permit from the Division of Reclamation. It also sought an order instructing Joy to comply with R. C. Chapter 1514.

On January 29, 1979, the trial court entered a judgment, which stated, in pertinent part:

"It is therefore ORDERED, ADJUDGED and DE-CREED that the defendants, and each of them, and their agents, their employees, and anyone in concert with them be and they are hereby permanently enjoined from engaging in surface mining as defined in [R. C.] 1514.01(A)***, until such time as they obtain a permit from the plaintiff.

"It is further ORDERED, ADJUDGED and DECREED that the defendants shall, at the first reasonable opportunity, reclaim the defendant Joy's real property in accordance with the requirements of [R. C.] Chapter 1514 and the rules and regulations of the plaintiff."

The defendants have appealed this judgment (case No. F-79-3 in this court).[1]

In May of 1979, plaintiff filed "Charges in Contempt" with the Court of Common Pleas. It was alleged that the

---

[1] Reporter's Note: Appendix A, which is a copy of the entire January 29, 1979 judgment entry, has been deleted from the reported decision.

defendants continued to engage in unlawful surface mining and had not initiated reclamation operations pursuant to the trial court's order of January 29, 1979. On July 5, 1979, the contempt matter was heard, the parties having entered into the following factual stipulation:

"The parties hereby stipulate that between May 17th and June 8th of this year [1979], defendants G. M. Sader Excavating and Paving, Inc., and William Joy used a front end loader and other earth moving equipment to remove sand from a sand knob located on premises originally the subject of this suit, for the commercial purposes of the defendants."

The transcript of these proceedings was not transmitted to this court until January 17, 1980.

The trial court found that the defendants had not violated the portion of the January 29, 1979 order enjoining surface mining. However, it held that they had failed to comply with that portion of the order concerning *land reclamation*. Joy and the Sader Corporation were, therefore, found to be in contempt of court and each was fined $10,000. The finding of contempt has been appealed to this court (case No. F-79-9).[2]

The history of these cases is as follows.

On October 7, 1977, Mr. Terrence Van Offeren, a certified inspector for the Division of Reclamation, saw a truck carrying a large load of sand to a construction site in Bowling Green, Ohio. "G. M. Sader Excavating and Paving" was printed on its side.

Later that day the inspector contacted Gregory M. Sader, president of the Sader Corporation, and informed him that a permit had to be obtained before the Sader Corporation could engage in surface mining operations. Mr. Sader replied that he had no intention of getting a permit since the type of activity he was engaged in did not come within the scope of R. C. Chapter 1514.

Several weeks later Mr. Sader's attorney, Thomas Middleton, phoned Inspector Van Offeren and said that he did not believe that R. C. Chapter 1514 applied to his client's activities. Inspector Van Offeren reported this to his supervisors in Columbus. They told him that the Sader Corporation was

---

[2] Reporter's Note: Appendix B, which is a copy of the July 19, 1979 journal entry finding the defendants in contempt of the January 29, 1979 entry, has been deleted from the reported decision.

engaged in surface mining and would be required to obtain a permit. Inspector Van Offeren passed this information along to Attorney Middleton and requested that he (Van Offeren) be sent a list of all sites from which the Sader Corporation was removing sand. In November of 1977, Attorney Middleton supplied such a list.

On June 7, 1978, Inspector Van Offeren discovered that agents of the Sader Corporation were removing sand from Joy's Swan Creek Township property. Joy testified that the Sader Corporation had initiated this operation in the fall of 1977. Nevertheless, this site was not noted on the list that Attorney Middleton gave to Inspector Van Offeren. No permit had been issued for this work. Inspector Van Offeren began to investigate. He inspected the Swan Creek Township site 12 different times in the course of his investigation.

The evidence showed that Joy was one of the Sader Corporation's employees and that he played an active role in the Sader Corporation's removal of sand from his property. The Sader Corporation paid Joy 20 cents for each cubic yard of sand removed. The trial court found that the Sader Corporation and unknown persons had removed 15,000 tons of sand from the Joy property over a four-to-five-year period. It should be noted here that R. C. 1514.01 to 1514.05 were amended, effective March 15, 1979; hence, unless otherwise stated, references to sections in R. C. Chapter 1514 refer to the pre-amendment sections.

*I. Case No. F-79-3.*

From the trial court's order of January 29, 1979, the defendants set forth their first assignment of error as follows:

"The trial court committed error to the prejudice of defendants-appellants in failing to dismiss the amended complaint and in denying judgment in their favor at the close of the evidence since injunctive relief is not properly available in the instant case."

Thus, the initial question for our determination is whether injunctive relief was a proper remedy in this case. We find the first assignment of error not well taken for the following reasons.

In Ohio an injunction is proper if there is no adequate legal remedy to prevent serious injury. 29 Ohio Jurisprudence 2d, Injunctions, Section 12.

Thus, the issue raised by the defendants is whether the trial court was barred from granting injunctive relief when there was a penal section available, *e.g.*, R. C. 1514.99(A).

In *Renner Brewing Co.* v. *Rolland* (1917), 96 Ohio St. 432, the Supreme Court stated, in the second paragraph of the syllabus, as follows:

"Where the averments of a petition would, if proven, entitle the plaintiff to an injunction, a writ will not be refused merely because the acts sought to be enjoined are punishable under the criminal statutes of this state."

That reasoning of the Supreme Court has been followed by the Ohio courts in other cases. In *State, ex rel. Chalfin,* v. *Glick* (1961), 172 Ohio St. 249, 254, the Supreme Court held that, as a matter of law, injunctive relief is available:

"The rule in Ohio, as well as the general rule, is stated in 43 Corpus Juris Secundum, 764, Section 152, as follows:

" 'Injunction will issue to protect public rights, property, or welfare notwithstanding the acts enjoined may also constitute crimes.

" 'Where an injunction is necessary for the protection of public rights, property or welfare, the criminality of the acts complained of does not bar the remedy by injunction, and the court will consider the criminality of the act only to determine whether, under the particular circumstances, equitable intervention is necessary.***' "

Further, one of the more recent, reported, Ohio Court of Appeals' opinions, considering the availability of injunctive relief in the presence of a penal or criminal statute punishing the same conduct, is the case of *State, ex rel. Bosch,* v. *Denny's Place* (1954), 98 Ohio App. 351. Therein, the Court of Appeals sustained the issuance of an injunction prohibiting the sale of intoxicating liquor on defendant's premises until the defendant had acquired a liquor license from the state. The court dismissed defendant's argument that the remedy of injunctive relief was unavailable because the sale of liquor without a license was illegal:

"That the lack of jurisdiction of courts of equity to enjoin crimes as such is no more clear than its jurisdiction to enjoin common nuisances and that the facts calling for equitable intervention are also denounced as criminal is of no significance.***" *Id.,* at 358.

See, also, *Widmer* v. *Fretti* (1952), 95 Ohio App. 7, and *Cleveland* v. *Amalgamated Assn. of Street Electric Ry. & Motor Coach Employees* (1949), 85 Ohio App. 153. In these cases, the courts considered whether injunctive relief was available, where the acts to be enjoined were crimes. Thus, it is clear that, in the mainstream of Ohio law, where criminal penalties are specifically set forth in the statutes, the court is not deprived of its duty to enjoin conduct for which a license is required.

Thus, it can be seen that Ohio courts routinely enjoin conduct for which a license is required by state law, even where the licensing statute includes penal-sanction provisions for unlicensed activity.

Thus, we conclude that the instant action was an appropriate case for exercise of the court's equitable powers, because the state has a legitimate interest in protecting the integrity of its surface mining regulatory scheme. The state of Ohio has a constitutional interest in the protection and conservation of the state's natural resources. Section 36, Article II, Ohio Constitution.

The defendants' second assignment of error is as follows: "The Ohio Surface Mining and Reclamation Act (R. C. Chapter 1514) is unconstitutional in both its scope and application and thus a judgment based thereon was in error."

We have examined this assignment of error, and based upon our previous discussion as set forth in our answer to Assignment of Error No. 1, find this assignment of error to be not well taken.

The first portion of defendants' third assignment of error (Subsection A) is as follows: "The decision of the trial court was against the manifest weight of the evidence since plaintiff-appellee failed to sustain the burden of proof on all material allegations and elements of his cause of action."

We agree that where injunctive relief is sought, a party must meet a degree of proof higher than a mere preponderance of the evidence. The degree of proof required to invoke the powers of equity must be clear and convincing and unexceptional. 29 Ohio Jurisprudence 2d, Injunctions, Section 179.

Defendants concede that it is clear that an appellate court may not substitute its own judgment for that of the trial court.

*State* v. *Pettit* (1969), 20 Ohio App. 2d 170, 174; *State* v. *Wallen* (1969), 21 Ohio App. 2d 27, 34, affirmed (1971), 25 Ohio St. 2d 45. We have examined the record thoroughly, including the Findings of Fact and Conclusions of Law of the trial court, and find that there is evidence of a substantial character to support the finding and judgment below and thus this court must affirm the judgment on appeal.

Defendants argue that the evidence fails to establish by clear and convincing evidence that defendants were engaged in "surface mining" activities.

To come within the scope of R. C. Chapter 1514, a person must be engaged in "surface mining." The legislature (prior to amending the statute in 1979) defined the term "surface mining" in R. C. 1514.01(A) as follows:

" 'Surface mining' means all or any part of a process followed in the production of minerals from the earth or from the surface of the land by surface excavation methods, such as open pit mining, dredging, placering, or quarrying\*\*\*."

Thus, critical to the establishment of what is to be considered "surface mining" is the understanding and application of the term "excavation." The Division of Reclamation has defined "excavate" in Ohio Adm. Code 1501:14-3-01(K) as follows:

" 'EXCAVATE' means to remove overburden, minerals, or incidental coal from a natural deposit *in the process of surface mining.*" (Emphasis added.)

This leads one, after an analysis of both the rule and statute, with the impression that if you are surface mining you are excavating, and if you are excavating you are surface mining.

We agree with the defendants' proposition of the general principle of law that it is well established that the legislature is empowered to define any word it uses, and the courts are bound thereby. However, it is equally as clear that the judiciary must interpret any terms which are ambiguous and unclear. Where such ambiguities exist, the rule of construction to be applied is clear. This rule is stated in 50 Ohio Jurisprudence 2d, Statutes, Section 181, at pages 156-157:

"Words of a statute, in common use or other than terms of art or science, will be construed in their ordinary acceptation and significance and with the meaning commonly attributed

to them, or as otherwise stated, will be given their natural, literal, and full meaning, unless a contrary intention appears. Thus, in the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will be given their common, ordinary, and accepted meaning in the connection in which they are used." (Footnotes omitted.)

Thus, we are faced with a determination of what the word "excavate" means in its common, ordinary meaning under the circumstances of this case.

Webster's Third New International Dictionary (1976 Ed.) defines "excavate" as "1: to hollow out***3: to dig out and remove (as earth or mineral matter)***." Cases are cited by defendants in support of their definition of the terms "excavate" and "excavation." In *United States* v. *Blauner Construction Co.* (D. Mass. 1941), 37 F. Supp. 968, 970, the court construed the term "excavation," as used in a subcontract, to mean "hollowing out or digging out***to expose***[a] cavity." In *Orr Ditch & Water Co.* v. *Justice Court of Reno Twp.* (1947), 64 Nev. 138, 177, 178 P. 2d 558, the term "excavation" was construed to mean "an opening or cavity in the earth of a kind or type similar to a shaft or a hole." In *Rochez Bros., Inc.,* v. *Duricka* (1953), 374 Pa. 262, 267, 97 A. 2d 825, the word "excavate" was held to mean "to make a hole or cavity in, hollow out, scoop, dig or cut a hollow in."

We agree with the defendants that the evidence at the initial trial of this matter *did not* " establish that the defendants-appellants dug a pit." The testimony of the state's witness, Inspector Van Offeren, was to the effect that the property adjacent to the Joy property was on a base grade (elevation) of 673 feet. The elevation of the Joy property, prior to the activity in question, was 689 feet. Thus, defendants argue that no "pit" or "hollow" was created, *i.e.,* there was merely a leveling, and, therefore, the evidence failed to establish that "excavation" and "surface mining" had occurred.

If the entire subsection of the statute in question, R. C. 1514.01(A), is read in its entirety, it is clear that the legislature did not intend to confine the meaning of the term "excavate" to "digging out a pit." This is so because R. C. 1514.01(A) distinguishes between mining by surface excavation methods and mining carried out beneath the surface of the ground by means of tunnels, shafts, or other similar holes, dug into the

earth. Furthermore, R. C. 1514.01(A) expressly includes, in the definition of "surface mining," mining methods which do not necessarily involve digging pits into the earth. Again, in R. C. 1514.01(B), the term "mineral" is defined to include natural deposits of sand located *on* as well as *in* the earth, necessarily suggesting that the legislature intended for removal of such deposits to be considered "surface mining" for regulatory purposes.

Moreover, if the term "surface mining" and its subordinate term, "surface excavation methods," are considered in light of the legislature's purpose in enacting R. C. Chapter 1514, it becomes more than clear that the legislature intended the term, "surface mining," to include the removal of sand knobs from the surface of the earth. From another view of the entire section (R. C. 1514.01), we conclude that this section was enacted to moderate the adverse impacts of uncontrolled surface mining on the public health and safety, the natural beauty of the state of Ohio, the environment of the state, and the future use of the land being mined. It is evident from the testimony that the defendants' operation posed the same kind of threat to these interests that other types of surface mining posed. It would be reasonable to conclude that if we were not, admittedly, dealing with a sand knob, but were dealing with a hillside or mound upon the surface of the earth, which was being extracted for its coal content, the same principles would apply. Based upon this analysis, it would be unreasonable to conclude that the legislature intended to exempt the defendants' activities from the requirements of R. C. Chapter 1514. While we agree that there was no pit or hollow created by the activities of the defendants, we do not find that it was necessary that a removal of minerals beneath the base grade (elevation) is what the legislature intended.

For this reason, we find this portion of defendants' Assignment of Error No. 3 (Subsection A) not well taken.

As Assignment of Error No. 3, Subsection B, defendants urge that the evidence failed to establish that defendants were "operators" within the scope of R. C. Chapter 1514.

We find from an examination of the record that there was ample evidence to sustain the plaintiff's position that, based upon even a "calculated" figure of the amount of tonnage which was removed, the evidence was sufficient to bring the

defendants within the R. C. 1514.01(G) definition of "operators," and that they were, therefore, required, prior to the removal of the mineral, to obtain a permit as provided elsewhere in R. C. Chapter 1514. It is elementary that if the record contains evidence which will substantiate the findings of the trial court, a reviewing court will not reverse. In the case *sub judice,* the trial court set forth very extensive Findings of Fact and Conclusions of Law, which are supported by the evidence in the record.

For the foregoing reasons, we find defendants' Assignment of Error No. 3, Subsection B, to be without merit.

Defendants' Assignment of Error No. 3, Subsection C, reads as follows:

"The evidence failed to establish any irreparable harm to either plaintiff-appellee or the people of the state of Ohio in general."

Plaintiff went to great lengths to bolster his position through the testimony of the investigating officer, Inspector Van Offeren. From our reading of the record, there was a great deal of speculation as to the possible future harm to the property of defendant Joy and to the adjoining property. Defendants argue that no testimony was introduced indicating that the plaintiff, representing the people of the state of Ohio, would suffer any harm.

Defendants further argue that to grant injunctive relief, in the absence of proof of irreparable harm, the statute relied upon must grant a specific cause of action for injunctive relief. Defendants note that, in actions involving the Ohio Strip Mining Act (R. C. Chapter 1513), injunctive relief is provided for in R. C. 1513.15(A), but, in contrast, R. C. Chapter 1514 makes no mention of an action for injunctive relief. However, we are of the opinion that these two chapters must be considered in *pari materia,* and thus come to the conclusion that injunctive relief is proper in R. C. Chapter 1514.

In our view, it is true that the record reveals that only remote and hypothetical "harm" was expressed by speculation. As expressed above, the witnesses for the plaintiff went to great length to show irreparable harm. We have examined the exhibits admitted, and the claim of irreparable harm is, at most, speculative. Small children's toys were shown to be located near a sand hill. In addition, there was speculation that

water contamination might result because of the sand removal, but no evidence that that would occur was offered. Also, much was said regarding the possible damage if reclamation did not occur. It cannot be said that defendants would not reclaim the land on their own volition. However, we believe that the issue of irreparable harm was a question to be answered by the trier of the facts, and he did so. Again, this court will not reverse absent a finding that a clear abuse of discretion or interpretation of the facts and the law has been shown. For these reasons, Subsection C of the third assignment of error is found not well taken.

Subsection D of the defendants' third assignment of error is as follows:

"The evidence fails to establish an absence of an adequate remedy at law."

Citing the penalty section as set forth in R. C. 1514.99, defendants argue that if the alleged harm was irreparable, it would not have been necessary for the legislature to enact the monetary penalty portions of that section, and that the plaintiff could have filed a criminal action under R. C. 1514.99(A). Thus, defendants argue that an adequate remedy in law does exists and that plaintiff's case must fail because he did not pursue that remedy.

We have answered this question above and find that Subsection D of the third assignment of error is not well taken.

Defendants set forth their fourth assignment of error as follows:

"The trial court committed error to the prejudice of defendant-appellant William Joy in holding him to be an 'operator' since such was neither pleaded nor proved."

From the record, it is uncontroverted that the Sader Corporation and Joy were joint venturers in this operation. We have answered this assignment of error previously and find it not well taken.

The trial court, after hearing the evidence and considering the exhibits, filed a judgment entry, containing Findings of Fact and Conclusions of Law, with the Court of Common Pleas on January 29, 1979.

From our examination of the record, we find that the trial court has made an excellent analysis of the facts presented and the applicable law.

Based upon the above conclusions, we find that substantial justice has been done the parties complaining, and the judgment of the trial court in case No. F-79-3 is affirmed in all respects.

II. *Case No. F-79-9.*

We come now to consider case No. F-79-9, which was consolidated with case No. F-79-3 for oral argument and decision. From the record, we note that the complaint in case No. F-79-3 was originally filed in the trial court on June 22, 1978, and was disposed of by judgment entry on January 29, 1979. The complaint for case No. F-79-9 was filed in the Court of Common Pleas of Fulton County on May 25, 1979, and is entitled "Charges in Contempt of Court." The complaint correctly alleged that the trial court permanently enjoined the defendants from engaging in surface mining, as defined in R. C. 1514.01(A), on defendant Joy's property until the defendants obtained a surface mining permit from the Ohio Division of Reclamation and ordered the defendants, "at the first reasonable opportunity," to reclaim the real property on which the defendants conducted their allegedly, unlawful surface mining operation, in accordance with the requirements of R. C. Chapter 1514 and the rules and regulations thereunder. The complaint further alleged that the defendants should have begun to reclaim defendant Joy's real property on March 10, 1979, and, in violation of the trial court's order, the defendants failed at that time, and subsequently thereto, to reclaim defendant Joy's real property, and had, instead, continued their allegedly, unlawful surface mining operation on such property. The complaint further alleged that the defendants' actions constituted wanton disregard and contempt of the lawful order of the trial court and caused an obstruction of the administration of justice. Plaintiff asked that the trial court issue an order requiring the defendants to appear and show cause why the defendants should not be held in contempt of court and be accordingly fined or imprisoned, or both.

A hearing was had on said motion to show cause on July 5, 1979, before the trial court. After said hearing, the trial court on July 19, 1979, found, as stipulated to, that the defendants removed sand from the defendant Joy's property between May 17th and June 8th of 1979, as part of and incidental to the construction of a utility building on Joy's land; that, as of the

date of the hearing, the defendants had not begun to reclaim any portion of the Joy land which had previously been surface-mined by defendants; that defendants had had ample opportunity to reclaim Joy's land; and that the defendants' failure to reclaim areas of the Joy land which had previously been surface-mined by the defendants constituted willful disobedience of the lawful order of the court issued on January 29, 1979.

In its finding and order of July 19, 1979, the trial court evidently reconsidered its finding that the defendants had been engaged in surface mining and made a specific finding that defendants' removal of sand from Joy's land, between May 17 and June 8, 1979, being incidental to construction, was *not* surface mining as defined in R. C. 1514.01(A). It is to be noted that R. C. 1514.01(A) was amended by the legislature between the time the original complaint was filed with respect to case No. F-79-3 and the time that the allegation of contempt was filed and that the new section became effective on March 15, 1979. The amendment provides certain exceptions to the definition of "surface mining."

R. C. 1514.01(A), as amended, provides, in pertinent part, as follows:

" 'Surface mining' * * * does not include: * * * the removal of minerals *incidental to construction work,* provided that the owner or person having control of the land upon which the construction occurs, the contractor, or construction firm possesses a valid building permit * * *." (Emphasis added.)

Prior to the hearing on July 5, 1979, the parties stipulated as follows:

"The parties hereby stipulate that between May 17th and June 8th of this year [1979], defendants G. M. Sader Excavating & Paving, Inc., and William Joy used a front end loader and other earth moving equipment to remove sand from a sand knob located on the premises originally the subject of this suit, for the commercial purposes of the defendants."

From the record of the July 5, 1979 hearing, it is apparent that the plaintiff rested his case without calling *any* witnesses to support his case in chief, although several affidavits had been filed.

Thereafter, Mr. Sader took the stand, acknowledged awareness of a permanent injunction, but indicated that, in his

opinion, he was *not* violating the order. He indicated that the post-March 15, 1979 oral agreement between Joy and the Sader Corporation was intended to put the Joy property in such condition that it would be usable for building purposes and, further, that more sand (beyond what had been removed prior to the issuance of the injunction) had to be removed to give the high banks a gradual slope to provide proper drainage and proper reclamation pursuant to the prior court order. Mr. Sader further testified that Joy was to provide a valid building permit prior to any sand removal. Joy actually sought this building permit, but a letter was introduced into evidence from the Fulton County Regional Planning Commission, stating that no building permit was necessary. Seeding of the slope was going to be done after the building, or buildings, was completed. Upon cross-examination by the state, Mr. Sader reiterated that some reclamation (although not seeding) had, in fact, begun.

Defendant Joy next took the stand and indicated that he desired to build both a pole building as well as a type of residence, the exact variety of which had not been decided upon at the date of the hearing. He testified that to facilitate the intended project and to insure that Ohio law would not be violated, he attempted to procure a building permit, but was informed in writing by the planning commission that none was needed in Swan Creek Township. He indicated that he did not feel that he was violating the prior order of the court since the law had changed and since some further removal of sand was necessary to facilitate reclamation as ordered while still serving his building plans.

After the defendants rested, the state called one William Boyle, an employee of the Division of Reclamation. He indicated that he did not think that reclamation had begun. In response to a question on direct examination, Boyle indicated that the term "reclamation" usually meant seeding. On cross-examination, Boyle indicated a familiarity with building practices and indicated that seeding would generally not be done until the slope and construction had been finished.

At the conclusion of final arguments of counsel, the trial court found that the defendants were not violating that portion of the prior order relating to surface mining activity since they came within the exceptions of amended R. C. 1514.01(A).

However, the court did find that there had been little or no effort to comply with the prior order as it related to *reclamation* of the land affected, and entered a finding of contempt and fined each of the defendants the sum of $10,000. It is from that order that the appeal is taken in case No. F-79-9.

For their first assignment of error defendants allege as follows:

"The trial court committed error to the prejudice of the defendants-appellants in issuing the finding of contempt of court since movant failed to sustain his burden of proof on each material element/fact of the motion."

It is obvious, by its finding in the contempt proceedings, that the trial court found that there was no violation of the "surface mining" allegation. The trial court implicitly held that the removal *was* incidental to construction and, thus, lawful. The remaining issue then is whether the plaintiff established, by clear and convincing evidence, that the defendants willfully violated or disregarded the order of the trial court as to reclamation.

A reading of the record of the proceedings on July 5, 1979, convinces us that there was no willful or wanton disregard and contempt of the lawful order of the court. Defendants had excavated; as a result thereof, at one end of the excavation area a 14-foot embankment remained. In an attempt to remove the allegation of the plaintiff that this situation created a safety hazard, the defendants admittedly cut down this high embankment, sloping it to a gradual incline, thus removing a possible safety hazard, as well as removing a possible water contamination problem. Admittedly, they sold the sand which was removed by the sloping operation. But, what were they to do with it? In an attempt to comply with the court's order to reclaim, they were found to be in contempt of the order of the court. This is a somewhat illogical conclusion.

Further, the definition of the word "reclaim," as set forth in the Department of Natural Resources, Division of Reclamation, rules and regulations, Ohio Adm. Code 1501:14-3-08, entitled "Resoiling," is difficult to apply in this case. Subsections (A), (B), (C) and (D) of the rule, with respect to "resoiling," or "reclamation," make reference to how topsoil or subsoil is to be redistributed over the surface of the affected area or how it shall be stored until such time as the area is to be resoiled. It

must be remembered that in this case there was no topsoil to begin with, the area being a barren sand knob, and, therefore, there was no topsoil to be saved and put back on after the subsoil was removed. Subsection (F) of the rule provides that the "* * * surface of the affected area [is] to be planted to establish a suitable seedbed." The testimony adduced from the defendants indicates that that is exactly what was intended to be done. The state's witness testified that this is done when the planned construction has been completed. The question then becomes when the seeding is to take place; and, the state's witness, an expert, testified that this should be done at the completion of the construction.

From our reading of the entire record, we are of the opinion that this assignment of error is well taken. Defendants did comply with the previous order of the court enjoining them from engaging in surface mining until such time as they obtained a permit from the appellee. We find no error therein. However, we find that the defendants, coming within the recently enacted exception to the statute (R. C. 1514.01[A] ), were making a reasonable effort to reclaim the area and thus were not in contempt of the January 29, 1979 order of the trial court. From our view of the record, defendants were attempting to comply with the order of the court and, at the same time, prepare the land properly so that defendant Joy could build thereon. We conclude that the spirit of the order and the law was not violated and that the defendants were acting in good faith and without the intention of violating the literal language of the statute, the promulgated rules, and the order of the court.

For the foregoing reasons, Assignment of Error No. 1, with respect to case No. F-79-9, is well taken.

For their second assignment of error defendants argue as follows:

"The trial court committed error to the prejudice of defendants-appellants by imposing a penalty in excess of that provided by the Ohio Revised Code."

We find this assignment of error not well taken. Defendants rely upon R. C. 2705.05 and 2727.12. It is well established that the power of a Court of Common Pleas to impose a penalty for civil contempt is inherent and cannot be limited by legislative enactment. While R. C. 2705.05 and 2727.12 set

ceilings on the amount of fines, $500 and $200, respectively, that a court may impose for contempt, a long line of Ohio cases holds that the provisions of these statutes are cumulative. Defendants have admitted that, in their attempt to comply with the court order to reclaim the affected area, they were attempting reclamation efforts through a continuing removal of sand for a period of 30 days; hence, an aggregate fine in the amount of $700 per day of violation would have been proper. Thus, it is evident that the trial court could have imposed a fine of $21,000 upon each of the defendants. Even if the fines were not aggregated, the result is that the trial court could have imposed a fine of $15,000, *i.e.,* $500 per day, upon each of the defendants. We find no error in the amount of the fines levied by the trial court.

However, for the reasons set forth as applied to Assignment of Error No. 1, with respect to case No. F-79-9, we find that substantial justice has not been done the parties complaining and the judgment of the trial court, with reference to the fines levied in the contempt of court proceedings, is reversed.

*Judgment in case No. F-79-3 affirmed.*
*Judgment in case No. F-79-9 reversed.*

POTTER, P. J., and BROWN, J., concur.