NATIONAL LIME & STONE COMPANY, Appellee,

v.

DIVISION OF MINES AND RECLAMATION, OHIO DEPARTMENT OF NATURAL RESOURCES, Appellant.

[Cite as *Natl. Lime & Stone Co. v. Div. of Mines & Reclamation, Ohio Dept. of Natural Resources* (1997), 122 Ohio App.3d 602.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–97–26.

Decided Sept. 11, 1997.

*Brady, Coyle & Schmidt, L.L.P.,* and *Brian P. Barger,* for appellee.

*Betty D. Montgomery,* Attorney General, and *Kristin K. Bennett,* for appellant.

SHAW, Judge.

This is an appeal by the Division of Mines and Reclamation, Ohio Department of Natural Resources, from the judgment of the Common Pleas Court of Allen County reviewing an order of the Reclamation Board of Review.[1] The common pleas court ruled that the board's decision, which denied appellee, National Lime & Stone Company ("National"), modification of its mining and reclamation permit, be vacated in part and remanded in part.

The following facts are relevant to the instant appeal. Between 1984 and 1986, National mined the limestone quarry known as the Lima No. 2 quarry located in Allen County pursuant to permit 541 from the Division of Mine and Reclamation. During its surface-mining operation, a sixty-foot highwall was created in the quarry. In 1986, National moved its primary mining operation to another location, maintaining permit 541 as a reserve site.

In April 1988, National submitted an application to the division for renewal of its surface-mining permit. On August 31, 1988, the chief of the division approved National's application. The approved mining and reclamation plan as provided in its application specified that the intended future use of the permit area would be a private water impoundment. The plan also stated that highwalls National created during mining would be included in the final land form. These remaining

---

1. Now the Reclamation Commission. However, for purposes of this appeal, we will refer to the agency as it existed at the time of the proceedings in this case.

highwalls would be stabilized through removal of loose material by angle drilling and/or scaling. The plan further identified specific grasses and legumes to be planted during reclamation. The chief of the division subsequently issued National's renewal permit. Although National's mining permit was renewed in 1989, mining operations did not resume.

Since the early 1990s, National had discontinued pumping water out of the quarry, and as a result, the quarry filled with water. In 1994, National sold the quarry site to private individuals. At the time of the sale, the water level in the quarry was approximately five feet below the top of the highwall. The quarry is now a privately owned lake.

On December 6, 1995, National submitted to the division a request to modify two aspects of its mining and reclamation plan. First, National sought removal of highwalls from the final land form because the groundwater level was above the top of the exposed rock face. Second, National proposed that native or volunteer diverse vegetative cover be designated as adequate to comply with the reclamation requirements. On January 25, 1996, the division disapproved National's requested modification.

On appeal by National, the board viewed the site of the Lima No. 2 quarry in May 1996. At that time, the water level in the quarry was approximately six to eight feet above the top of the submerged rock face. An evidentiary hearing followed, and on October 2, 1996, the board issued its findings of fact, conclusions of law, and decision affirming the division's disapproval of National's request. In its conclusions of law, the board held in paragraphs seven through nine:

"7. The highwall exposed during mining on permit IM–541 remains a highwall, even though submerged in water and intended to be left as part of a permanent impoundment.

"8. National must take some action to stabilize the highwall on permit IM–541 in a manner that will ensure public safety.

"9. National's reclamation plan must contain a revegetation plan that ensures a diverse vegetative cover."

National appealed to the common pleas court. The court interpreted the term "highwall" set forth in Ohio Adm.Code 1501:14–1–01 to import an exposed rock face, using the common meaning of the term "exposed." Specifically, the trial court found that "expose" means "to make visible or known; display, reveal, or exhibit." American Heritage Dictionary of the English Language (1969) 463. Additionally, the common pleas court stated that this meaning of the term is not contrary to the legislative purpose behind R.C. 1514.02 to protect the safety of the public, as an underwater rock face does not cause a threat to public safety. Following its interpretation, the court held that because the rock face was now

under water, it was no longer "exposed" and thus vacated that portion of the board's decision denying National's modification request in regard to reclamation of a former highwall now submerged in water.

However, in regard to the board's denial of National's request to modify the revegetation requirement in the reclamation plan, the common pleas court remanded this issue to the board. Noting that National might be required to supplement the volunteer vegetation with further revegetation in order to fully establish a diverse vegetative cover in compliance with R.C. 1514.02(A)(9)(e), the court held that the quarry area must be inspected and reviewed in order to determine the suitability of existing volunteer vegetation.

On appeal to this court, the division raises the following three assignments of error:

"The court of common pleas erred in reversing the findings of the commission and in finding that the proposed modification satisfies the technical requirements of R.C. 1514.02(A)(9) because the [board's] decision that the proposed modification did not meet the technical requirements of R.C. 1514.02(A)(9) is supported by reliable, probative and substantial evidence and is in accordance with law.

"The court of common pleas erred in finding that the underwater rock face at the Lima No. 2 quarry does not cause a threat to public safety.

"The court of common pleas erred in holding that a highwall that becomes submerged in a quarry ceases to be a highwall for purposes of R.C. 1513.14(A)(9)(C)."

The assignments of error will be discussed together. Appellant contends that the common pleas court exceeded its standard of review in issuing its decision and further erred in making findings that are contradictory to those of the board. Appellant argues that the evidence shows that National's request for modification failed to satisfy several of the performance standards imposed by R.C. 1514.02(A)(9). In particular, appellant claims that the request would leave the highwalls in an unstable condition and with a steep slope, posing a hazard to public safety.

As to the proper standard of review, the Ohio Supreme Court has stated that the review in an appeal from an order of the board is a limited one. *Pleasant City v. Ohio Dept. of Natl. Resources, Div. of Reclamation* (1993), 67 Ohio St.3d 312, 316, 617 N.E.2d 1103, 1107. The court then cited R.C. 1513.14(A), which states:

"The court shall affirm the decision of the board unless the court determines that it is arbitrary, capricious, or otherwise inconsistent with law, in which case the court shall vacate the decision and remand to the board for such further proceedings as it may direct."

■ R.C. Chapter 1514, the Ohio Surface Mining and Reclamation Act, was enacted to ensure the future usefulness of the land being mined and to moderate adverse effects of surface mining on the public health and safety, the natural beauty of the state, and the environment. *Call v. G.M. Sader Excavating & Paving, Inc.* (1980), 68 Ohio App.2d 41, 49, 22 O.O.3d 36, 41–42, 426 N.E.2d 798, 804. R.C. 1514.02(A)(9) requires that a surface mine operator submit with its permit application a reclamation plan for the area affected by surface mining. The reclamation plan must state what measures the operator will perform to achieve the general performance standards as set forth in division (A)(9). In particular, subsection (c) requires plans to do the following:

"(c) Grade, contour, or terrace final slopes, wherever needed, sufficient to achieve soil stability and control landslides, erosion, and sedimentation. Highwalls will be permitted if they are compatible with the future uses specified in the plan and measures will be taken to ensure public safety. Where ponds, impoundments, or other resulting bodies of water are intended for recreational use, establish banks and slopes that will ensure safe access to those bodies of water. Where such bodies of water are not intended for recreation, include measures to ensure public safety, but access need not be provided."

Pursuant to R.C. 1514.02(E), the reclamation plan may be amended with the approval of the chief of the division. That statute states as follows:

"(E) An operator, at any time and upon application therefor and approval by the chief, may amend the plan of mining and reclamation filed with the application for a permit in order to change the reclamation measures to be performed, * * * provided that the plan, as amended, includes measures that the chief determines will be adequate to prevent damage to adjoining property and to achieve the performance standards set forth in division (A)(9) of this section."

As to the definition of "highwall," Ohio Adm.Code 1501:14–1–01(S) defines it as "the steeply inclined unexcavated face of exposed consolidated materials or exposed consolidated overburden in an open cut of a surface mine." At the evidentiary hearing held in this case, District Supervisor Boyle of the Division gave testimony that "exposed," as the term applies to a "highwall" in mining, means that portion of the rock face that has been opened or excavated for the purpose of removing a minable product during the mining operation. He maintains that a highwall, regardless of whether it is submerged, remains a highwall subject to reclamation.

In agreeing with the division's definition, the board stated that "[a]llowing a pit to fill with water does not change the fact that the material in a highwall is exposed. Infiltration of groundwater into an open pit changes only the nature of the matter the highwall is exposed *to*—it becomes exposed to water rather than exposed to air." Thus, the submergence of a highwall does not change its

essential character and does not remove the need to stabilize the highwall to ensure public safety.

To the contrary, National argues that previous decisions and actions of the Division support a definition of a "highwall" as being visible and that the trial court was correct in so deciding. As an example, National points out that in the original permit application issued to Western Ohio Stone, which was transferred to National in 1984 at the time of purchase, the division approved a plan for reclamation in which scaling of loose rock would be done only to that portion of the rock face above the water level. Also, National claims that the inspections performed at the quarry site by the division's inspectors focused on scaling only that portion of the rock face that was visible above the water level.

■■■ However, we cannot accept the trial court's definition of a "highwall." Instead, we agree with the division's and the board's interpretation of the term. We note that "when interpreting statutes, [courts] must give due deference to an administrative interpretation formulated by an agency which has accumulated substantial expertise, and to which the legislature has delegated the responsibility of implementing the legislative command." *State ex rel. McLean v. Indus. Comm.* (1986), 25 Ohio St.3d 90, 92, 25 OBR 141, 143, 495 N.E.2d 370, 371.

Nevertheless, we would reach the same result regardless of whether we give deference to the division's and the board's interpretation. To construe "highwall" to mean that once the highwall is submerged in water it is no longer visible and thus no longer considered a highwall would be to jeopardize Ohio's reclamation standards associated with surface-mining operations, as well as future planning for reclamation.

Furthermore, although the water level in the quarry has risen and thus completely submerged the rock face, the water level could fluctuate in the future. If the highwall should no longer be totally submerged, the word "exposed" would then be completely superfluous. Thus, it is only logical to construe the Ohio Adm.Code 1501:14–1–01(S) definition of "highwall" as including the highwall existing at the Lima No. 2 site at this time. Accordingly, we find that the common pleas court improperly determined that the board's denial of modification in regard to a former "highwall" was arbitrary, capricious, or otherwise inconsistent with law.

■■■ However, this does not mean that the submerged nature of the permit area cannot be taken into consideration under the circumstances of this case to alter reclamation measures which meet the goals of reclamation. It is apparent from the board's conclusions of law that the board concluded that "National must take some action to stabilize the highwall on permit IM–541 in a manner that will insure public safety." According to Dan Mapes, Director of Safety and Environ-

mental at National, he met with division supervisor Boyle at the site when the water in the quarry was within five feet of the top of the highwall to discuss reclamation alternatives for that site. The discussion focused on scaling that needed to be done between the top of the rock and the surface of the water.

Furthermore, the division's own witnesses and inspection records suggest that the division's primary concern at this time in providing public safety was limited to the upper reaches of the submerged highwall. It appears that the prior approval of the original permit application by the division is consistent with this assertion. Indeed, division supervisor Boyle admitted that the fact that the quarry is now full of water could be a valid reason to request a modification. Nevertheless, we need not make such a determination in the case at bar.

Lastly, with regard to the reclamation requirements of R.C. 1514.02(A)(9) concerning revegetation of the area affected by mining, two pertinent sections provide for an obligation to do the following:

"(d) Resoil the area of land affected * * * and maintain a diverse growth of vegetation adequate to bind the soil and control soil erosion and sedimentation;

"(e) Establish a diverse vegetative cover of grass and legumes or trees, grasses, and legumes capable of self-regeneration and plant succession wherever required by the plan."

As stated above, National proposed to alter its revegetation plan to allow the revegetation to be accomplished through the volunteer growth on site.

R.C. 1514.02(B) sets forth the standard applicable to the disapproval of National's proposed amendment and states:

"(B) No permit application or amendment shall be approved by the chief if the chief finds that the reclamation described in the application will not be performed in full compliance with this chapter or that there is not reasonable cause to believe that reclamation as required by this chapter will be accomplished.

"The chief shall issue an order denying an application for an operating permit or an amendment if the chief determines that the measures set forth in the plan are likely to be inadequate to prevent damage to adjoining property or to achieve one or more of the performance standards required in division (A)(9) of this section."

In affirming the decision of the division disapproving National's proposal, the board stated that the evidence at the hearing and the site view conducted by the board revealed that volunteer vegetation has been quite successful on the affected area. However, the board found that this would remove the necessity for National to actively revegetate the area and that the division stressed that it could not simply approve a plan to allow Mother Nature to revegetate a permit

area. Notably, National's request to modify its revegetation plan did not discuss, or even identify, the species of volunteer growth on site. The board believed that a revegetation plan must be more specific. Accordingly, the board agreed that the chief should not accept a revegetation plan that simply proposes the acceptance of volunteer growth on an affected area. The board then concluded that National's reclamation plan must contain a revegetation plan that ensures a diverse vegetative cover.

The trial court recognized the effect of the denial on the unique set of facts involved in the case *sub judice* and ordered that the suitability of the existing natural vegetation be considered in conjunction with supplementing it to comply with the reclamation requirements of R.C. 1514.02(A)(9). For example, division supervisor Boyle admitted that there is a variety of natural vegetation covering the affected area. He also gave testimony that because National had an approved plan of revegetation, National should then have sought a change to include some kind of supplemental effort in lieu of ripping out the established vegetation. We concur with this analysis. However, since additional reclamation work may be necessary on the site as discussed above and given the fact that the board found the particular modification request to be deficient, we cannot find that the board's decision to uphold the chief's disapproval on this issue was arbitrary and unreasonable. Presumably any review of the revegetation proposals for the quarry will consider its effects on the new owner.

Accordingly, to the extent indicated, the appellant's assignments of error are well taken. The judgment of the common pleas court is reversed, and the board's decision to deny National's proposed modification is reinstated.

*Judgment reversed.*

THOMAS F. BRYANT and HADLEY, JJ., concur.