CLAY et al.

v.

HARRISON HILLS CITY SCHOOL DISTRICT BOARD OF EDUCATION et al.*

Court of Common Pleas of Ohio,
Harrison County.

No. 99–477–CV.

Decided Aug. 1, 1999.

---

* Reporter's Note: No appeal has been taken from the judgment of the court.

14

*Freifield, Bruzzese, Wehr, Moreland, Straus & Spahn* and *G. Daniel Spahn,* for plaintiffs.

*Bricker & Eckler, James P. Burnes* and *Susan L. Oppenheimer; Thomas, Fregiato, Myser, Hanson & Davis* and *Rodney D. Hanson,* for defendants.

WILLIAM F. CHINNOCK, Judge.

This is an injunction action brought by three Harrison County residents, taxpayers, and members of Parents Against Consolidation ("PAC") against the Harrison Hills Superintendent of Schools ("Superintendent") and the Harrison Hills City School District Board of Education ("Board"). PAC prays for an injunction to enjoin the Superintendent and Board from finalizing the consolidation and reorganization of the Harrison Hills City School District ("District"), which combines the three high schools in the District into a single high school located in Cadiz, Ohio, renamed from Cadiz High to Harrison Hills Central High, makes assignment changes regarding the elementary and middle schools, and closes one school building.

The District covers a geographic area of 386 square miles, including most of Harrison County and extending into five surrounding counties. Three school districts in Ohio with areas of over 400 square miles have a single high school, as do three school districts with areas between 300 and 400 square miles. In the past quarter century, enrollment in the District has plummeted about forty percent, from approximately 3,700 students to about 2,300 students, with present enrollment consisting of about 1,100 students in the high schools and 1,200 students in the elementary and middle schools.

A host of factors gave rise to this legal controversy. First, the need exists for extensive and expensive repairs to ensure the safety of the aging school buildings of the District, most of which are three-quarters of a century old, and one which will celebrate its century anniversary next year. Second, for many years the District has had the desire but not the financial ability to improve its quality of education to match that of other school districts. Third, on November 11, 1997, the Ohio legislature enacted Senate Bill No. 55, which increases state minimum

graduation standards from 18 to 21 credit units, requiring three additional classes in core subjects, such as English and science, for every high school student graduating in the year 2001 and thereafter. Fourth, and most importantly, the voters of the District have rejected seven school levies over the 2¾-year period between March 1996 and November 1998.

The Superintendent and Board move to dismiss this case upon the basis that PAC lacks standing to sue as taxpayers, citizens, or parents. *Valley Forge Christian College v. Americans United for the Separation of Church & State* (1982), 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700; *State ex rel. Masterson v. Ohio State Racing Comm.* (1954), 162 Ohio St. 366, 55 O.O. 215, 123 N.E.2d 1; *Doremus v. Borough of Hawthorne Bd. of Edn.* (1952), 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475. These supporting cases are limited to their particular facts, however, and the Ohio Constitution, Section 16, Article I, expresses the fundamental principle that wherever there is a right, there is a remedy:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

Upon this basis, this court holds that PAC has standing to sue for redress of its grievances.

The primary claim of PAC is that the Superintendent and Board's motive in consolidating the school district is "to punish the voters" for rejecting the series of levies, and therefore that their actions regarding consolidation constitute an "abuse of discretion." PAC's supporting arguments allegedly demonstrating an abuse of discretion include (a) transportation distance will be increased for some students (*i.e.,* having to travel 30 rather than 15 miles each way between home and school), (b) loss of enrollment of 143 students opting to attend school outside the District, resulting in a loss to the District in excess of $500,000 in state funds, (c) lack of opportunity for citizen input before the Board's decision to consolidate, constituting a violation of Ohio's "open-meeting law," (d) petitions requesting the Board to reverse its decision to consolidate signed by 1,900 of the 10,000 registered voters in the county (5,300 voters cast ballots in the November 1998 levy election), and (e) the District's allegedly favorable financial status (6–30–98 general fund balance of $1.3 million and general operating revenues exceeding expenditures by $1.2 million; 6–30–99 general fund balance of $1.5 million and general operating revenues exceeding expenditures by over $500,000).

The Superintendent and Board readily and effectively respond to PAC's arguments. Regarding transportation, the Superintendent and Board present evidence that most students will spend less time on the school bus than in previous years, and there will now be separate buses for students in grades K–6

and 7–12. PAC's evidence as to a decrease in enrollment of 143 students is countered by the Superintendent and Board demonstrating that similar reductions occurred in previous years, with PAC admitting upon cross-examination that it has no proof that consolidation is the cause of these students' departing the District. Regarding the opportunity for citizen input, the Superintendent and Board show that the Board conducted half-hour citizen dialogue sessions before its regular meetings, altered its meeting sites for greater citizen exposure, and spent several lengthy sessions listening to the demands of PAC. PAC relies upon the Board's 1986 written policy statement affirming that in arriving at its decisions, it will give "substantial weight" to advice from citizens and community groups. The Board, however, points out its policy's qualifying language: "[B]ut [it] will use its best judgment in arriving at decisions." Further, PAC admitted upon cross-examination that the Board did in fact use its best judgment in making the decision to consolidate, an admission which could be considered to be determinative of the case at bar. PAC's argument that the Superintendent and Board violated the "open meetings" law (R.C. 121.22), is countered by evidence that each Board meeting was preceded by prior notice to the public, each meeting was verbally announced to the public at the preceding meeting of the Board, and Board minutes note public participation at virtually every Board meeting; thus, the Board went beyond what is required of it by law in soliciting input from the public and listening to community members' concerns. Although PAC's petition drive is impressive, its only significance lies in its possible persuasive effect on the Board; it has no legal significance. PAC's allegedly favorable "snapshot" financial picture of the District is countered by the Superintendent and Board's pointing out that the law of Ohio prohibits a school district from entering into transactions involving the expenditure of money unless it can certify that it has sufficient revenues to cover educational expenditures for the next three fiscal years, and that budget projections without the levy funds and without consolidation thrusts the District into a deficit position during the three-year period (about $600,000 deficit in 2001, and about $3,500,000 deficit by 2003). R.C. 5705.412.

■ The Superintendent and Board respond to PAC's major "punish the voters/abuse of discretion" argument by demonstrating that not only did they give fair advance warning to the community that consolidation would become necessary if the November 1998 levy failed, but also that their sole motive for consolidation is the betterment of educational opportunity for the students, considering the necessity of repairing aging school buildings and meeting the additional state requirements, all in the face of a lack of necessary operating and capital funds. Persuasive evidence of the Superintendent and Board's good will in rendering their decision to consolidate is that without consolidation, the additional state requirements would necessitate 11 to 16 additional teachers at an expenditure approximating $500,000, placing the District into a projected deficit

position within a three-year period, contrary to law, whereas through consolidation not only will the additional state requirements be met, but also educational opportunity will be increased by the offering of over 50 additional courses to all high school students in the new centralized location, yet while preventing a projected deficit. Education and fiscal responsibility dictated the consolidation, and the Superintendent and Board acted with utmost good faith and exercised their discretion judiciously. One will search in vain for legal authority to support the proposition that superintendents of schools and boards of education must satisfy students, parents, or for that matter even the courts, on matters of consolidation before they can exercise the broad powers conferred upon them by law to manage and control the schools of their district.

Ohio's public school system is of paramount importance to the citizens of Ohio. As declared by the Supreme Court of Ohio in *Powell v. Young* (1947), 148 Ohio St. 342, at 358–359, 35 O.O. 322, at 329, 74 N.E.2d 261, at 269:

"The finest possible public school system has been one of the primary objectives of Ohio from its very beginning. In the Ordinance for The Government of The Territory of The United States Northwest of The River, passed by Congress on July 13, 1787, before the Constitution of the United States was adopted, it was provided: 'Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.' This has been our goal ever since."

■ By virtue of Section 3, Article VI of the Ohio Constitution, the Ohio General Assembly has full power and authority to regulate the public school system in the state of Ohio. *State ex rel. Cincinnati School Dist. v. Cincinnati* (1850), 19 Ohio 178; *Mills v. City Bd. of Elections* (1896), 54 Ohio St. 631, 47 N.E. 1114. It has done so by mandating that "the board of education shall provide for the free education of the youth of school age within the district of its jurisdiction, at such places as will be most convenient for the attendance of the largest number thereof." R.C. 3313.48.

■ The black-letter law of Ohio is irrefutable that the legislature has vested the superintendents of schools and boards of education with almost unlimited reasonable authority to manage and control the schools within their districts:

" * * * [T]he actual creation and arrangement of school districts are administration matters. To the extent that a state or local board has the power to initiate such changes, the matter is addressed to the sound discretion of the board. Thus, where an administrative board has power to decide whether territory shall be transferred from one school district to another, or whether such school districts shall be consolidated or merged, the matter lies within the sound discretion of the board.

"The statutes investing county boards of education with the power to change the boundary lines of school districts evince a legislative purpose to repose a discretion in the judgment of such board. The presumption is that the legislature intended to rely upon the sound judgment of the county boards to make such arrangement of the territory of the respective districts as would best serve the comfort, health, and education of the pupils. Thus, the county board is given wide latitude and a broad discretion in these matters.

"To the extent that an administrative authority is lawfully exercising its discretion and is not transcending its statutory powers, its action with regard to school districts may not be controlled by the courts. Thus, if the organization of the district is against the interests of the school system, the remedy is with the legislature, not the courts. A court cannot substitute its judgment for that of the county board of education upon a mere difference of opinion. If the administrative board acts within the power conferred upon it by statute, the board's judgment is subject to review by the courts only when the board acts fraudulently or in bad faith, or where there has been such arbitrary, unreasonable, or unlawful action as constitutes an abuse of discretion." 82 Ohio Jurisprudence 3d (1999) 188–190, Schools, Sections 67–69.

"Since the control and management of the schools of the state is given to the boards of education by statute, these boards cannot be interfered with, coerced, or restrained in any manner by a court with regard to carrying into effect their determination of any question within their legitimate jurisdiction except where the boards have acted arbitrarily or abused their discretion, or where there is fraud, bad faith, or collusion on the part of such boards in the exercise of their statutory authority. In other words, the grant of discretionary power by the legislature to a board of education cannot be circumscribed by the courts, where the exercise of such power is reasonable, in good faith, and not clearly shown to be an abuse of discretion or in violation of the state or federal constitution." 82 Ohio Jurisprudence 3d (1999) 284–286, Schools, Section 116.

R.C. 3313.47 provides that "each * * * board of education shall have the management and control of all of the public schools of whatever name or character that it operates in its respective district." R.C. 3319.01 provides that the Superintendent shall have the right and duty to "assign pupils of the schools under his supervision to the proper schools and grades." The school board need not ratify his action and has no statutory authority to overrule it. 1933 Ohio Atty.Gen.Ops. No. 1832. R.C. 3313.49 provides that the "board of education * * * may suspend * * * any school in such district because of disadvantageous location or any other cause. Whenever any school is suspended, the board of education of the district shall at once provide for the assignment of the pupils

residing within the territory of the suspended school to such other schools as are named by said board."

A plethora of authority holds that public officials, such as school superintendents and members of boards of education, are presumed to have acted in a valid manner and in good faith. *Kneale v. Jennings* (1924), 111 Ohio St. 637, 146 N.E. 87; *State ex rel. Maxwell v. Schneider* (1921), 103 Ohio St. 492, 134 N.E. 443; *Craggett v. Cleveland Bd. of Edn.* (N.D.Ohio 1964), 2 Ohio Misc. 7, 30 O.O.2d 276, 234 F.Supp. 381. The exercise of honest judgment by the Superintendent and Board cannot constitute an abuse of discretion, even if that judgment is erroneous. *Adams v. Bd. of Edn.* (Nov. 30, 1972), Cuyahoga App. No. 32152, unreported. The interest of the community as a whole and not that of the smaller number in affected areas dictates the action taken by a board and superintendent entrusted with the education of all children in a school district. *Zejmowicz v. School Trustees* (1971), 133 Ill.App.2d 735, 272 N.E.2d 783. There is no absolute right to attend the school of one's preference, or the school nearest one's home. It is the responsibility of the superintendent and board to decide how pupils will be assigned to the various facilities. *Assn. for Defense of Cent. High School v. Columbus Bd. of Edn.* (Tenth App. Dist.1983), 10 Ohio App.3d 126, 10 OBR 151, 460 N.E.2d 725. No parent or child has the right to select the public school the child is to attend. R.C. 3319.01. The superintendent of schools is entitled to the presumption that his student reassignment plan is a proper exercise of his duty under the statute providing that the superintendent shall assign pupils to the proper schools. R.C. 3319.01; *Dodd v. Rue* (1979), 64 Ohio Misc. 21, 18 O.O.3d 75, 411 N.E.2d 201.

The "arranging of [school] districts is an administrative matter." *Ross v. Adams Mills Rural School Dist.* (1925), 113 Ohio St. 466, at 481, 149 N.E. 634, at 638, citing *Kneale v. Jennings, supra.* The soundness of policy underlying consolidation and reorganization by the superintendents and boards of education is not for the courts to decide. Nor will courts substitute their judgment for that of those duly entrusted by law to make these decisions. *Greco v. Roper* (1945), 145 Ohio St. 243, 30 O.O. 473, 61 N.E.2d 307; *State ex rel. Lewis v. Wilmington School Dist. Bd. of Edn.* (1940), 137 Ohio St. 145, 17 O.O. 480, 28 N.E.2d 496; *Brannon v. Tiro Consol. Bd. of Edn.* (1919), 99 Ohio St. 369, 124 N.E. 235; *Dworken v. Cleveland Bd. of Edn.* (Ohio App.1951), 63 Ohio Law Abs. 10, 108 N.E.2d 103. Neither the management of the public schools vested in superintendents and boards of education nor their management decisions will be interfered with by the courts in the absence of a showing of fraud or abuse of discretion. *Frederick v. Owens* (1915), 25 Ohio N.S. 581. Courts will not restrain the actions of elected officials in carrying out their conferred powers where there

is no bad faith or gross abuse of discretion. *Cincinnati v. Wegehoft* (1928), 119 Ohio St. 136, 162 N.E. 389.

Where injunctive relief is sought, the standard of proof is higher than a mere preponderance of evidence; the degree of proof required to invoke the powers of equity must be clear and convincing. *Call v. Sader Excavating* (Sixth App.Dist.1980), 68 Ohio App.2d 41, 22 O.O.3d 36, 426 N.E.2d 798; *Cash v. Brookshire United* (Tenth App.Dist.1988), 61 Ohio App.3d 576, 573 N.E.2d 692; *S. Ohio Bank v. S. Ohio Sav. Assn.* (First App.Dist.1976), 51 Ohio App.2d 67, 5 O.O.3d 183, 366 N.E.2d 296; *White v. Long* (First App.Dist.1967), 12 Ohio App.2d 136, 41 O.O.2d 200, 231 N.E.2d 337. Great caution should be exercised when a court of law is requested to constrain the functions of other branches of government. *Dandino v. Hoover* (1994), 70 Ohio St.3d 506, 639 N.E.2d 767. Caution should be exercised in granting injunctions, especially in cases affecting public interest where the court is asked to interfere with or suspend operation of important public works or to control action of government. *Country Club Hills Homeowners Assn. v. Jefferson Metro. Hous. Auth.* (1981), 5 Ohio App.3d 77, 5 OBR 189, 449 N.E.2d 460.

Although it is commendable that citizens and taxpayers take the initiative to challenge government action which they deem to be arbitrary or unreasonable, it is clear in the case *sub judice* that the Superintendent and Board acted at all times to preserve educational integrity and to promote the betterment of education, and that none of PAC's offerings of proof even remotely evinces an abuse of discretion by the Superintendent or Board. The most that can be said is that there is a mere difference of opinion as to the wisdom of the decision to consolidate. In previous years, the Superintendent and Board's response to levy defeats consisted of (1) a reduction in force in teaching personnel (*i.e.,* fewer teachers, higher student-teacher ratio, larger class sizes, and fewer subjects for students to select), (2) a reduction in force for support staff (fewer bus drivers, custodians, aides, and cooks), and (3) a reduction in purchase of instructional supplies and educational equipment. The Superintendent and Board determined in 1998 that any further reductions would be substantially detrimental to the quality of education made available to the students of the District. After the sixth levy attempt failed, the Board held a special meeting on August 11, 1998, and in open session the Superintendent and Board specifically advised the community that consolidation would be the only rational course of action to take should the November 1998 levy fail. The Superintendent specifically advised that this reasonable forewarning should not be construed as a threat but rather as a frank and candid notice which allowed the voters to make the ultimate determination as to what action they desired their school officials to take in regard to the composition of the school district. The Superintendent and Board emphatically

"told it like it is," giving prior notice to the public as to the consequences of their collective decision at the polls. The voters spoke through their ballots, and the Board as the representative of the people then carried out the clear mandate of the electorate. It is difficult to comprehend how public officials can properly be criticized for doing exactly what they promised the public they would do. By giving advance notice and then carrying out the dictates of the voters, the Superintendent and Board showed the utmost good faith and demonstrated their genuine and deep concern for preserving the educational integrity of the District and the education of all students of the community.

For an injunction to issue, PAC must show by clear and convincing evidence (1) that it has a clear right to the relief requested, (2) that it will suffer irreparable injury if the injunction does not issue, (3) that any injury to it if the relief is not granted outweighs the harm to the Superintendent and Board if the relief is granted, and (4) that the public interest will be served by granting the injunction. *Dodd, supra; Dublin Citizens Against Redistricting v. Dublin Bd. of Edn.* (Sept. 26, 1991), Franklin C.P. No. 91 CVH04–343, unreported. PAC has failed to show that it has a clear right to an injunction because (1) no student has an absolute right to attend the school of his or her preference or the school nearest his or her home, (2) the Board has statutory authority to manage and control the public schools in its district, and (3) "[t]he interests of the community as a whole, and not of the smaller number in an affected area, should dictate the action taken by a Board and by the school authorities invested with the education of all children in a school district." Nor can PAC show the required "irreparable harm," or that any harm to it outweighs the harm to the Superintendent and Board which would result if the injunction were to be granted. *Adams; Dodd; Dublin; Assn. for Defense of Cent. High School v. Columbus Bd. of Edn., supra;* R.C. 3313.47; *Ferris v. Paulding Exempted Village School Dist. Bd. of Edn.* (Third App.Dist.1982), 7 Ohio App.3d 163, 7 OBR 208, 454 N.E.2d 957. Any incidental harm suffered by a small number of students (the only evidence of harm offered by PAC was to six students who will have longer bus rides under consolidation) if relief is denied PAC, would be vastly outweighed by the harm to the 2,300 students of the Harrison District if relief were granted to PAC.

PAC did not contest the educational and other associated benefits of consolidation. Although there is no legal duty upon the Superintendent and Board to demonstrate improvement in the quality of education through consolidation, the evidence nevertheless is undisputed that consolidation will result in significant and substantial educational, athletic, and fiscal benefits, including:

(1) *Increased Educational Benefits to Students:* More than 50 new courses will be offered to all high school students, resulting in the District's exceeding state minimum standards.

(2) *Increased Athletic Benefits to Students:* All junior high and high school students will have the opportunity to participate in football, golf, and wrestling, which was not the case before; entire high school athletic program is changed to new Conference with more divisions, better competition, more athletic scholarships, and more flexibility in scheduling.

(3) *Increased Transportation Benefits to Students:* The overwhelming majority of students will be picked up later by bus for school (earliest pick-up time at least 20 minutes later than last year) and will spend less time on the bus than last year; elementary school students will ride different buses than high school students, instead of having K–12 all on the same bus as in the past.

(4) *Increased Athletic Benefits to Girls:* Girls' freshman volleyball and basketball teams and girls' varsity and reserve fast-pitch softball teams will be added.

(5) *Increased Educational and Travel Benefits to Severe Behavioral Handicapped Students:* Students with similar disabilities will be placed in the same program; SBH students will travel shorter distances in less travel time; SBH programs will be at several locations rather than a single location.

(6) *Increased Fiscal Responsibility:* Increased transportation costs from consolidation will be more than offset by the savings in revenue as a result of consolidation.

 An unreasonable delay in taking legal action which results in a change of position by the defendant in reliance upon plaintiffs' inaction, constitutes "laches" which precludes recognition of legal rights the plaintiffs may otherwise have had should they have exercised their rights in a timely manner. *Piatt v. Longworth's Devisees* (1875), 27 Ohio St. 159, 1875 WL 159; *Paschall v. Hinderer* (1876), 28 Ohio St. 568, 1876 WL 31; *Berkmeyer v. Kellerman* (1877), 32 Ohio St. 239, 1877 WL 114. Contrary to PAC's argument that irreparable harm will result should the Superintendent and Board not be enjoined from effectuating consolidation, it is evident that PAC slept on its rights, and that irreparable harm would occur to the students, parents, school personnel, and citizens of the Harrison School District if the requested injunction were granted. The evidence demonstrates that upon the voters' making known their wishes in November 1998, the Superintendent and Board immediately began taking action to consolidate, including the completing of new curriculum; the purchase of books, materials, and athletic equipment; the hiring of personnel; the scheduling of sports programs; the assignment of students to schools; the issuance to students of class schedules and student orientation; the moving of furniture and supplies into different schools; the scheduling of transportation; the reorganization of technology; the forming of booster clubs; the selection of school names, colors, and mascots; and numerous other actions which could not at this time be

reversed without irreparable harm. PAC was required to bring suit to exercise its legal rights within a reasonable time after November 24, 1998, when the Board voted to rename the new high school Harrison Central High School. The stark truth of the matter is that consolidation was an accomplished reality before this action was filed on May 28, 1999. PAC's response regarding laches, that it waited over one-half year after the failure of the levy, until almost 90 days before the commencement of classes for the 1999–2000 year to file this action, because it was not sure of the number of students who would opt to attend schools outside the District, is unpersuasive. Thus, even assuming *arguendo* that an abuse of discretion occurred, which it did not, PAC failed to exercise its legal rights in a timely fashion and caused the present circumstances to be created by the actions taken by the Superintendent and Board in reliance upon the inaction of PAC. PAC cannot at this late date have realistic expectations that reversal of this already-completed consolidation would be in the best interests of the students or citizens of this community.

 In summary, courts do not act as a "super" board of education and second-guess the wisdom of the educational policies of superintendents and boards of education in managing the schools. Unless a gross abuse of discretion is shown, the Superintendent and Board are the sole judges of education policy and benefits. The Superintendent and Board acted in utmost good faith in forewarning the voters regarding the consequences of the November 1998 levy, and then carrying out the mandate of the people in accordance with the demonstrated wishes of the voters. The consolidation as executed results in the betterment of education, despite some inconvenience to a small number of students regarding transportation. Any minor inconvenience suffered by these students is substantially outweighed by the interest of the community as a whole in academic excellence in every school in the District. Any reversal of the Superintendent and Board's already-executed plan of consolidation would create turmoil and chaos and result in irreparable harm to thousands of students and the community.

This court will not substitute its judgment for the judicious decision and actions of the Superintendent and Board. PAC's prayer for issuance of an injunction is denied. The Superintendent and Board are entitled to judgment in their favor, and it is so rendered. Costs to be paid by PAC.

*Judgment accordingly.*

WILLIAM F. CHINNOCK, J., retired, of the Cuyahoga County Juvenile Court, sitting by assignment.